# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

TIPAKSORN TUNGJUNYATHAM,    )    1:06-cv-1764-SMS
                           )
            Plaintiff,     )    ORDER ON DEFENDANT'S MOTION FOR
     v.                    )    SUMMARY JUDGMENT OR, IN THE
                           )    ALTERNATIVE, MOTION FOR SUMMARY
MIKE JOHANNS, Secretary of the)    ADJUDICATION (DOC. 29)
U.S. Department of Agriculture)
Agency,                    )
                           )
            Defendant.     )
                           )
_____)

   Plaintiff is proceeding pro se with a civil action in this
Court. The matter has been referred to the Magistrate Judge for
all proceedings, including the entry of final judgment, pursuant
to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73(b), and Local Rule 73-
301. Pending before the Court is the motion of Defendant Mike
Johanns, Secretary of United States Department of Agriculture
Agency, for summary judgment or, in the alternative, for summary
adjudication, filed with extensive supporting papers on June 26,
2009. Plaintiff filed opposition and exhibits on July 17 and 22,
2006, but those documents were superseded by opposition and

exhibits filed on August 17, 2009 (Docs. 35 and 36).[1] Defendant
filed a reply with attachments on September 16, 2009; Plaintiff's
unsolicited responses filed on September 18, 2009, were stricken.

Plaintiff's claims include 1) discrimination based on
Plaintiff's Thai national origin in the form of a failure to
select her for a position for which she applied in 2002; 2)
retaliation for Plaintiff's having registered a formal EEO
complaint regarding wrongful denial of promotion, consisting of
retraining from September 17, 2004, until February 17, 2005, for
failure to pass pathology training despite Plaintiff's Ph.D.
degree in pathology from the University of Tokyo and her superior
pathology skills, and unspecified harassment and ethnic
intimidation, which resulted in a mental breakdown in December
2004; 3) wrongful termination; and 4) intimidation and violation
of privacy on March 3 and 6, 2006, when the agency representative
faxed confidential documents to Plaintiff's representative while
the latter was out of state. (Amended Sched. Rprt. (Doc. 14) pp.
1-3; Sched. Conf. Order (Doc. 15) pp. 2-4.)

I. Summary Judgment

Summary judgment is appropriate when it is demonstrated that
there exists no genuine issue as to any material fact, and that
the moving party is entitled to judgment as a matter of law.

---

[1] In the reply Defendant notes that Plaintiff failed to comply with Local
Rule 56-260(b) by failing to reproduce Defendant's undisputed facts and
admitting and denying the specific facts. Defendant does not directly seek any
relief with respect to Plaintiff's failure to comply with the rule. (Reply p.
2 n. 1.) The Court has broad discretion to interpret and apply its local
rules. Dulange v. Dutro Construction, Inc., 183 F.3d 916, 919 n. 2 (9th Cir.
1999). In the exercise of this discretion and the Court's inherent power to
control its docket and the disposition of its cases with economy of time and
effort for both the court and the parties, the Court will review the
evidentiary materials timely submitted by both parties to determine the
presence or absence of an issue of fact.

Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). It is the moving party's burden to establish that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. <u>British Airways Board v. Boeing Co.</u>, 585 F.2d 946, 951 (9th Cir. 1978).

Where a party with the ultimate burden of persuasion at trial as to a matter moves for summary judgment, it must demonstrate affirmatively by evidence each essential element of its claim or affirmative defense and must establish that there is no triable issue of fact as to each essential element such that a rational trier of fact could render a judgment in its favor. <u>Southern California Gas Co. v. City of Santa Ana</u>, 336 F.3d 885, 888 (9th Cir. 2003). If a party moves for summary judgment with respect to a matter as to which the opposing party has the ultimate burden of persuasion at trial, then the moving party must show that the opposing party cannot meet its burden of proof at trial by establishing that there is no genuine issue of material fact as to an essential element of the opposing party's claim or defense; the moving party must meet the initial burden of producing evidence or showing an absence of evidence as well as the ultimate burden of persuasion. <u>Nissan Fire Ltd. v. Fritz</u>

Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000). In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the opposing party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. Id. (citing High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563, 574 (9th Cir. 1990)). In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact. Id.

However, "where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." Celotex Corp. v. Catrett, 477 U.S. 317, 323. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a

4

genuine issue as to any material fact actually does exist. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits or admissible discovery material in support of its contention that the dispute exists. Rule 56(e); <u>Matsushita</u>, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." <u>T.W. Elec. Serv.</u>, 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments). The evidence of the opposing party is to be believed, <u>Anderson</u>, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts

placed before the court must be drawn in favor of the opposing
party, Matsushita, 475 U.S. at 587 (citing United States v.
Diebold, Inc., 369 U.S. 654, 655 (1962)(per curiam)).
Nevertheless, it is the opposing party's obligation to produce a
factual predicate from which an inference may be drawn. Richards
v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal.
1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Although the
Court must not weigh the evidence, the Court must draw reasonable
inferences; evidence that is too insubstantial or speculative may
be insufficient to establish the existence of a genuine issue of
material fact. Coca-Cola Co. v. Overland, Inc., 692 F.2d 1250,
1255 (9th Cir. 1982); Dept. of Commerce v. U.S. House of Rep., 525
U.S. 316, 334 (1999). To demonstrate a genuine issue, the
opposing party "must do more than simply show that there is some
metaphysical doubt as to the material facts." Matsushita, 475
U.S. at 586. A mere scintilla of evidence supporting the opposing
party's position will not suffice; there must be enough of a
showing that the jury could reasonably find for that party.
Anderson, 477 U.S. at 251-52. Where the record taken as a whole
could not lead a rational trier of fact to find for the nonmoving
party, there is no genuine issue for trial. Id. at 587.

The showings must consist of admissible evidence,
Hollingsworth Solderless Terminal Co. v. Turley, 622 F.2d 1324,
1335 n.9 (9th Cir. 1980), or pleadings, depositions, answers to
interrogatories, admissions, and affidavits or declarations, Fed.
R. Civ. P. 56(c). A court cannot draw an inference about facts
not specifically put in the record by a party, and a court will
not assume that general averments embrace specific facts needed

1  to sustain a complaint, <u>Lujan v. National Wildlife Federation</u>,

2  497 U.S. 871, 887 (1990). Legal memoranda and oral argument are

3  not evidence and do not create issues of fact capable of

4  defeating an otherwise valid motion for summary judgment. <u>British</u>

5  <u>Airways Bd. v. Boeing Co.</u>, 585 F.2d 946, 952 (9th Cir. 1978).

6      The Court is not obligated to consider matters that are in

7  the record but are not specifically brought to its attention; the

8  parties must designate and refer to specific triable facts. Even

9  in the absence of a local rule, for evidence to be considered,

10 the party seeking to rely on it must specify the fact by

11 indicating what the evidence is or says and must indicate where

12 it is located in the file. Although the Court has discretion in

13 appropriate circumstances to consider other material, it has no

14 duty to search the record for evidence establishing a material

15 fact. <u>Carmen v. San Francisco United School Dist.</u>, 237 F.3d 1026,

16 1029 (9th Cir. 2001).

17     A party moving for summary judgment is entitled to the

18 benefit of any relevant presumptions that support the motion

19 provided that the facts giving rise to the presumption are

20 undisputed. <u>Coca-Cola Co. v. Overland, Inc.</u>, 692 F.2d 1250, 1254

21 (9th Cir. 1982).

22          II. <u>Failure to Exhaust Administrative Remedies for</u>
              <u>Allegations concerning Nonselection for an FSIS position</u>
23            <u>in 2002 (EEO Number 040330)</u>

24     Title 42 U.S.C. § 2000e-16(c) provides that to bring a claim

25 in a district court pursuant to Title VII, a plaintiff must first

26 exhaust her or his administrative remedies, which includes filing

27 a civil action within ninety days after receipt of notice of a

28 final agency (EEOC) decision, 42 U.S.C. § 2000e-16(c), 29 C.F.R.

1  § 1614.407(c); <u>Charles v. Garrett</u>, 12 F.3d 870, 874 (9th Cir.

2  1993). The requirement of exhaustion must be demonstrated, or the

3  action is barred. <u>Brown v. General Services Administration</u> 425

4  U.S. 820, 831-33 (1976); <u>Nelmida v. Shelly Eurocars, Inc.</u>, 112

5  F.3d 380, 383 (9th Cir. 1997).

6       In a footnote (Motion p. 9 n. 5), Defendant argues that

7  Plaintiff's EEO claim number 40330 regarding her non-selection

8  for a FSIS position soon after she had been hired in 2002 is

9  time-barred.[2]

10      This argument concerns Plaintiff's allegations of

11 discriminatory conduct based on national origin or color in

12 violation of 42 U.S.C. § 2000e-2(a)(1) (Title VII), which makes

13 it an unlawful employment practice for an employer to fail or

14 refuse to hire or to discharge any individual, or otherwise to

15 discriminate against any individual with respect to his or her

16 compensation, terms, conditions, or privileges of employment

17 because of the individual's race or color. Included in the

18 complaint filed in this Court was a reference to a claim with EEO

19 number 040330, which Defendant characterizes as relating to

20 Plaintiff's non-selection for a position with the FSIS shortly

21 after Plaintiff was hired in 2002. (Cmplt. [Doc. 1], p. 2, ll.

22 17-18.)

23      Plaintiff admits in the course of narration in her

24 opposition that her judicial complaint filed in this action on

25

26      [2] This particular instance of non-selection is to be distinguished from
   the later allegedly discriminatory failure to hire Plaintiff for the
27 veterinary medical officer position with the Animal and Plant Health
   Inspection Service (APHIS) of the USDA, meant to address poultry with
28 contagious diseases, including Exotic Newcastle Disease (END), which is
   discussed later in this order.

December 7, 2006 (Doc. 1), erroneously and as a result of unintentional clerical error referred to EEO claim number 40330 on p. 2, lines 17 and 18; Plaintiff states that the issues described in that particular EEO complaint "never were stated in this civil action," the claim was closed at the EEOC OFO, and Plaintiff did not pursue the issue further.  (Opp. p. 2, ll. 9-20.)

It therefore appears that Plaintiff has admitted that she did not exhaust administrative remedies with respect to this claim. Although Plaintiff explains that the reference to the EEO claim was accidental, the allegations nevertheless remain in the complaint, which has not been amended.

The Court concludes that Plaintiff has failed to submit evidence sufficient to demonstrate a genuine dispute as to any material fact concerning exhaustion of administrative remedies with respect to Plaintiff's claim concerning non-selection for a FSIS position shortly after she was hired in 2002. Plaintiff's claim is thus barred, and Defendant is entitled to judgment on this claim.

III. <u>Timeliness of the Complaint with respect to Plaintiff's Termination</u>

Defendant argues that there is a bar to Plaintiff's claim that her removal from her position was discriminatory because Plaintiff failed to file a timely action in this Court.

Title 42 U.S.C. § 2000e-5(f)(1) provides in pertinent part:

> <u>If a charge filed with the Commission pursuant to subsection (b) of this section is dismissed</u> by the Commission, <u>or</u> if within one hundred and eighty days from the filing of such charge or the expiration of any period of reference under subsection (c) or (d) of this section, whichever is later, <u>the Commission has not</u>

9

<u>filed a civil action</u> under this section or the Attorney
General has not filed a civil action in a case
involving a government, governmental agency, or
political subdivision, or the Commission has not
entered into a conciliation agreement to which the
person aggrieved is a party, <u>the Commission, or the</u>
<u>Attorney General in a case involving a government,</u>
<u>governmental agency, or political subdivision, shall so</u>
<u>notify the person aggrieved and within ninety days</u>
<u>after the giving of such notice a civil action may be</u>
<u>brought against the respondent named in the charge (A)</u>
<u>by the person claiming to be aggrieved</u> or (B) if such
charge was filed by a member of the Commission, by any
person whom the charge alleges was aggrieved by the
alleged unlawful employment practice. (Emphasis added.)

This ninety-day period is a statute of limitations. <u>Scholar v.</u>
<u>Pacific Bell</u>, 963 F.2d 264, 266-67 (9th Cir.1992). Therefore, if
a claimant fails to file the civil action within the ninety-day
period, the action is barred. <u>Id.</u> at 267.

Defendant argues that because the case initially was set
before the MSPB, the governing statutes concerning the time for
filing the action here are 5 U.S.C. § 7702 and 7703(b), which
provide that if the aggrieved person seeks review of the MSPB
decision by the EEOC, a civil action for review of the EEOC's
decision "must be filed within 30 days after the date the
individual filing the case received notice of the judicially
reviewable action under section 7702." Defendant cites to <u>Sloan</u>
<u>v. West</u>, 140 F.3d 1255 (9th Cir. 1998), in which the Court
reviewed so-called mixed cases, such as the instant case, that
involve both a claimed adverse employment action and a related
Title VII violation, which may be exhausted for Title VII
purposes by asserting both claims before the MSPB, receiving a
decision from the MSPB, and either appealing thereafter to the
EEOC, or directly filing a district court action; if the
complaint is appealed to the EEOC, the employee may appeal to the

district court within thirty days of receipt of notice that the Commission concurs with the decision of the MSPB. 140 F.3d at 1258-61 (citing in part to 29 C.F.R. § 1614.310(d) and 5 C.F.R. § 1201.161(f)).

The parallel provisions concerning the time for filing a district court action set forth in §§ 2000-e-16(c) and 7703(b)(2) have been construed together. Lee v. Sullivan, 787 F.Supp. 921, 928 (N.D.Cal. 1992) (holding that it would be unjust to hold that a district court action was untimely where the notices given by the EEOC and MSPB inaccurately informed the plaintiff that she could only seek relief from the Court of Appeals and failed to inform her that she could obtain review in a district court).

Statutes of limitations such as these are subject to equitable tolling. See, Nelmida v. Shelly Eurocars, Inc. 112 F.3d 380, 384 (9th Cir. 1997). The doctrine of equitable tolling has been delineated as follows:

> A statute of limitations is subject to the doctrine of equitable tolling; therefore, relief from strict construction of a statute of limitations is readily available in extreme cases and gives the court latitude in a case-by-case analysis. See Harvey, 813 F.2d at 654. See also Espinoza, 754 F.2d at 1250. The equitable tolling doctrine has been applied by the Supreme Court in certain circumstances, but it has been applied sparingly; for example, the Supreme Court has allowed equitable tolling when the statute of limitations was not complied with because of defective pleadings, when a claimant was tricked by an adversary into letting a deadline expire, and when the EEOC's notice of the statutory period was clearly inadequate. See Irwin v. Veterans Admin., 498 U.S. 89, 111 S.Ct. 453, 457-58, 112 L.Ed.2d 435 (1990). See also Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 151, 104 S.Ct. 1723, 1725-26, 80 L.Ed.2d 196 (1984) (per curiam). Courts have been generally unforgiving, however, when a late filing is due to claimant's failure "to exercise due diligence in preserving his

legal rights." Irwin, 111 S.Ct. at 458. (Emphasis added.)

Scholar v. Pacific Bell, 963 F.2d at 267-68. See also, Gates v. Georgia-Pacific Corp., 492 F.2d 292, 295 (9th Cir. 1974) (equitable tolling appropriate for the failure to bring a civil action within thirty days after notification by the Commission, where the notification failed to inform the aggrieved person of the time period for bringing a civil action); Harms v. I.R.S., 321 F.3d 1001, 1007 (10th Cir. 2003) (noting that equitable tolling is permitted where a plaintiff is actively misled or prevented from asserting his rights, but not finding a basis for equitable tolling where although the notifying agency erroneously instructed him to take his claims to the MSPB, the aggrieved person was not misled and did not rely on the notice); Lucht v. Encompass Corp., 491 F.Supp.2d 856, 864-65 (S.D.Iowa 2007) (noting that equitable tolling is generally justified where the circumstances are truly beyond the control of the plaintiff, as when the notice from the EEOC is inadequate or the agency provides inaccurate or misleading information, and the plaintiff has been diligent, but declining to toll the deadline where the EEOC notice contained typographical errors but was essentially coherent).

Here, Defendant submitted in support of its motion the declaration of James E. Varsalone, who before retirement in 2008 served as the representative for the USDA in connection with Plaintiff's administrative claim relating to discrimination and alleged wrongful termination before the Merit System Protection Board (MSPD). Plaintiff's representative was Dr. Milosav Muller.

(Varsalone Decl., Doc. 29.5, ¶¶ 1-2.) Varsalone declared that Exhibit B to the declaration was a true and correct copy of the final decision upholding the termination of Plaintiff and finding no discrimination. (Id. at ¶ 3.) Exhibit B reflects that the EEOC reviewed the MSPB's decision in which the MSPB found no discrimination; the EEOC concluded that the MSPB's decision constituted a correct interpretation of the governing law and policies and was supported by the evidence. (Second page of Ex. B, marked as "4 OF 5" and "Exh 31 p4.") The following text appears in Defendant's Exh. B:

> This decision of the Commission is final, and there is no further right of administrative appeal from the Commissioner's decision. You have the right to file a civil action in an appropriate United States District Court, based on the decision of the Merit Systems Protection Board, **within thirty (30) calendar days** of the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title....

(Id.) The document continues with a specification of terms and statement of consequences of failure to name the correct person, and advice as to the right to request counsel. (Id.)[3]

---

[3] There has been no objection to Plaintiff's declaration, which consists of her opposition and list of exhibits, with a purported jurat (Doc. 35). The opposition contains factual assertions as well as argument and conclusions. The document is signed and notarized (Doc. 35 pp. 25-27). The jurat states in pertinent part the following:

I declare under penalty of perjury that it is true to the best of my knowledge and belief."

The qualification of truth "to the best of my knowledge and belief" is not in compliance with 28 U.S.C. § 1746, which requires that a declaration be subscribed as true under penalty of perjury, and be executed substantially in the statutory form, which in turn requires a declaration "under penalty of perjury that the foregoing is true and correct." 28 U.S.C. § 1746. Although a lack of swearing is not a fatal defect, the declaration must be made under penalty of perjury and must be attested to be true. Cobell v. Norton, 310 F.Supp.2d 77, 84 (D.D.C. 2004) (statement of truth based on "knowledge, information, and belief" insufficient); Kersting v. United States, 865 F.Supp. 669, 776-77 (D. Hawaii 1994) (necessary elements are that the unsworn declaration contains the phrase "under penalty of perjury" and states that the document is true). Here, the statement is only that it is true and correct as far as Plaintiff knows and believes. The nature and extent of that qualification is uncertain and is subject to being clarified only by Plaintiff.

However, as there has been no formal objection from Defendant, any objection is considered to have been waived.

1    In contrast, Plaintiff submitted a version of the final

2   decision of the EEOC OFO (Office of Federal Operations) that

3   issued on May 9, 2006, which she characterized in her opposition

4   (Opposition p. 5, Ex. 2) as containing a "right for

5   reconsideration." The document contained notice of a right to

6   file a civil action and advice that there was no further right of

7   administrative appeal from the Commission's decision; it also

8   contained advice regarding requesting counsel. However, preceding

9   those sections, it contained additional language that was not

10  contained in the version of the document presented by Defendant,

11  and sworn to without qualification by witness Varsalone, as the

12  decision of May 9, 2006:

<u>STATEMENT OF RIGHTS - ON APPEAL</u>

<u>RECONSIDERATION</u> (M0701)

> The Commission may, in its discretion, reconsider the
> decision in this case if the complainant or the agency
> submits a written request containing arguments or evidence
> which tend to establish that:
> > 1. The appellate decision involved a clearly erroneous
> >    interpretation of material fact or law; or
> > 2. The appellate decision will have a substantial
> >    impact on the policies, practices, or operations
> >    of the agency.
> Requests to reconsider, with supporting statement or brief,
> must be filed with the Office of Federal Operations (OFO)
> **within thirty (30) calendar days** of receipt of this decision
> or **within twenty (20) calendar days** of receipt of another
> party's timely request for reconsideration....

(Opp., p. 5, Exh. 2.) The text continued with citations to

applicable regulations and further directions for submitting

requests to reconsider, such as addressee and address, and

information concerning filing deadlines and proof of service.

(<u>Id.</u>)

     Plaintiff submitted documentation, which is not challenged

14

by Defendant, which reflected that Plaintiff timely pursued what she divined from the notice was a remedy by way of request for reconsideration, as distinct from further appeal to another administrative level. This documentation includes a timely motion for reconsideration by the EEOC of the decision submitted by her representative dated June 8, 2006, accompanied by a proof of service (P.'s Exh. 3), and a document entitled "ERRATA," dated November 3, 2006, signed for the Commission by the same Director of the OFO who had signed the final decision (that is, both final decisions or versions thereof) (P's Exh. 4). In the ERRATA, it was stated:

> The above captioned (sic) decision contained an error. The
> decision contained the right to reconsideration. There
> is no right to reconsideration on a petition form (sic)
> a Merit S Protection Board decision.
> This correction in no way alters the substantive content
> of the decision.

The corrected version of the decision followed, but it was still dated May 9, 2006. (P's Exh. 4.)

Thereafter, Plaintiff timely filed the instant action within thirty days of the presumed date of receipt. The decision issued on November 3, 2006; it was indisputably presumed received by November 8, 2006; and Plaintiff's complaint here was filed on December 7, 2006.

Inexplicably, the proofs of service of the significantly varying final decisions, both of which are dated with the same date of May 9, 2006, appear to be identical. Defendant does not directly address the cumulative evidence. However, the Court understands this evidence not to present a disputed issue of fact regarding the extent of notice given to Plaintiff, but rather to

1  reflect that information regarding a request for reconsideration
2  was originally included in the decision in May 2006 and was
3  subsequently removed in a version of the notice that was later
4  served on Plaintiff in November 2006.

5      The notice given to Plaintiff in May 2006 was inadequate to
6  inform Plaintiff that Plaintiff was required to file a civil
7  action or otherwise forfeit her claim. This is because the
8  decision purported to offer to Plaintiff a remedy that was an
9  alternative to appeal to a further or higher administrative level
10 (which the notice had foreclosed), and which likewise was
11 logically an alternative to filing a court action. It would make
12 no sense for Plaintiff or any reasonable person to seek judicial
13 review of an action that the Plaintiff was simultaneously
14 attempting to have the very body that made the decision
15 reconsider and change.

16     It is inferred and concluded that a reasonable person in
17 Plaintiff's position would understand from the advisements in the
18 initial decision that an alternative to seeking review in a court
19 action was seeking reconsideration from the Commission itself. If
20 there was ambiguity, it should not redound to the Defendant's
21 benefit. The undisputed documentary evidence reflects that
22 Plaintiff diligently sought relief pursuant to the notice. Once
23 Plaintiff was informed of the true state of affairs, she timely
24 sought review from the Court.

25     Plaintiff argues that it would be unfair to consider
26 Plaintiff's lawsuit untimely.

27     The Court agrees that it is antithetical to basic notions of
28 procedural fairness to penalize Plaintiff, who exercised

1  diligence at all apparent stages of the ripening administrative

2  proceedings, for relying on Defendant's instructions in the

3  decision. Defendant was indisputably and admittedly responsible

4  for the error in affirmatively representing to Plaintiff that

5  seeking reconsideration was a correct course of action;

6  Plaintiff, who has no known expertise in the pertinent subjects,

7  reasonably relied on Defendant's express directions and was

8  induced to follow a specified course of action; and Plaintiff was

9  diligent.

10      The instant case presents circumstances warranting an

11  equitable estoppel. As in <u>Lee v. Sullivan</u>, 787 F.Supp. 921

12  (N.D.Cal. 1992), where the plaintiff's action was filed more than

13  thirty days after the final decision, it was still timely where

14  the individual had not received accurate notice of her right to

15  proceed to sue.

16      The Court therefore concludes that Defendant has not

17  demonstrated that Plaintiff's complaint concerning her allegedly

18  wrongful termination was untimely or that Defendant is entitled

19  to judgment on that claim. Therefore, Defendant's motion for

20  summary adjudication on that claim will be denied.[4]

21      IV. <u>Failure of Plaintiff to Establish Prima Facie</u>
           <u>Claim of Discriminatory Non-selection</u>

22

23      Defendant contends that it is entitled to judgment on

    Plaintiff's claim concerning her failure to be selected for

24  positions in grade GS-12 because there is no genuine dispute as

25  to the material facts concerning Plaintiff's lack of the bona

26

27      [4] It should further be noted that although Plaintiff submits materials in opposition to the motion in an effort that might be interpreted as an effort to address the merits of the discriminatory termination claim, this issue is not raised in Defendant's motion (see Mot. p. i) and therefore is not before the Court.

28

1  fide occupational qualifications for the position.

2      The legal standards governing the appropriate analysis on

3  summary judgment of a claim concerning failure to hire or promote

4  are established and were recently stated in Dominguez-Curry v.

5  Nevada Transp. Dept., 424 F.3d 1027, 1037 (9th Cir. 2005) (a case

6  concerning discrimination based on gender, but equally applicable

7  to discrimination on the other statutory grounds):

> Title VII makes it an unlawful employment practice
> for an employer to refuse to hire an individual because
> of her sex. 42 U.S.C. § 2000e-2(a)(1). In responding to
> a summary judgment motion in a Title VII disparate
> treatment case, a plaintiff may produce direct or
> circumstantial evidence demonstrating that a
> discriminatory reason more likely than not motivated
> the defendant's decision, or alternatively may
> establish a prima facie case under the burden-shifting
> framework set forth in McDonnell Douglas Corp. v.
> Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668
> (1973). See McGinest, 360 F.3d at 1122....
>
> To make out a prima facie case under McDonnell
> Douglas, a plaintiff must show that (1) she belongs to
> a protected class; (2) she applied for and was
> qualified for the position she was denied; (3) she was
> rejected despite her qualifications; and (4) the
> employer filled the position with an employee not of
> plaintiff's class, or continued to consider other
> applicants whose qualifications were comparable to
> plaintiff's after rejecting plaintiff. See McDonnell
> Douglas, 411 U.S. at 802, 93 S.Ct. 1817. At summary
> judgment, the degree of proof necessary to establish a
> prima facie case is "minimal and does not even need to
> rise to the level of a preponderance of the evidence."
> Lyons v. England, 307 F.3d 1092, 1112 (9th Cir.2002)
> (quoting Wallis v. J.R. Simplot Co., 26 F.3d 885, 889
> (9th Cir.1994)).
>
> If established, the prima facie case creates a
> rebuttable presumption that the employer unlawfully
> discriminated against the plaintiff. Id. The burden of
> production then shifts to the employer to articulate a
> legitimate, nondiscriminatory reason for its action.
> Id. If the employer meets this burden, the presumption
> of unlawful discrimination "simply drops out of the
> picture." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502,
> 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The
> plaintiff then must produce sufficient evidence to
> raise a genuine issue of material fact as to whether

the employer's proffered nondiscriminatory reason is merely a pretext for discrimination. <u>Coleman v. Quaker Oats Co.</u>, 232 F.3d 1271, 1282 (9th Cir.2000). The plaintiff may show pretext either (1) by showing that unlawful discrimination more likely motivated the employer, or (2) by showing that the employer's proffered explanation is unworthy of credence because it is inconsistent or otherwise not believable. <u>Godwin v. Hunt Wesson, Inc.</u>, 150 F.3d 1217, 1220-22 (9th Cir.1998). Ultimately, the plaintiff's burden is to "produce some evidence suggesting that [the defendant's] failure to promote [her] was due in part or whole to discriminatory intent." <u>McGinest</u>, 360 F.3d at 1123.

<u>Dominguez-Curry v. Nevada Transp. Dept.</u>, 424 F.3d at 1037 (9th Cir. 2005).

Here, Plaintiff applied for a position with the Animal and Plant Health Inspection Service (APHIS) of the USDA. The position was for veterinary medical officers (VMO's) to address poultry with contagious diseases, including Exotic Newcastle Disease (END), a fatal and extremely infectious viral disease affecting all species of birds, including poultry, which is spread by direct contact between healthy birds and the bodily discharges of infected birds. The position was offered in Spring 2003 pursuant to the decision of Paul Ugstad, the Associate Director of the Eastern Region for the USDA, APHIS, and Dr. Jack Shere, the Area Commander for the END Task Force. Drs. Ugstad and Shere announced the vacancy and worked together on the selections because they were the two persons who would supervise the VMO's who were hired, Dr. Shere on the task force, and Dr. Ugstad thereafter. (Ugstad Decl. ¶¶ 1-6, Ex. C; Shere Decl. ¶¶ 1-6.) The position was created to investigate the disease, quickly address outbreaks, and educate members in the poultry community about the disease in order to avoid the spread of disease; thus, it was of

1  paramount importance that the communications of the task force
2  members be understood. (Id.)

3      Plaintiff asserts that she was a member of a protected class
4  or classes ("Asian Thai female" [Opp. p. 9], "Asian, Thai
5  national origin" [Opp. p. 18]) and argues that she was fully
6  qualified for a position.

7      As evidence of her being fully qualified for the position,
8  Plaintiff argues that she had already successfully completed a
9  one-year probationary period as a VMO with a performance rating
10 that was fully successful. However, there is no showing that the
11 particular mix of duties and skills pertinent to the position
12 that Plaintiff already held was sufficiently similar to the
13 position which Plaintiff sought to hold such that successful
14 performance of the one position warrants an inference that
15 Plaintiff was necessarily fully qualified for the other position,
16 or an inference to nullify or contradict any perceived defect in
17 Plaintiff's qualifications for the task force position.

18     Plaintiff asserts that at an unspecified time after she was
19 not selected, she inquired why she was not selected and stressed
20 the fact that about six positions of the advertised ten were
21 "unfulfilled." (Doc. 35 p. 9 l. 21.) She was told that the agency
22 had no money. The context, participants, and circumstances of
23 this particular exchange are not clear. Plaintiff argues that by
24 making such a statement, the agency violated Plaintiff's rights
25 or unlawfully singled her out from competition for the advertised
26 job position. However, given the generality of the evidence, it
27 does not warrant an inference of discriminatory or retaliatory
28 animus.

1    Plaintiff points to Dr. Fulnechek's compilation of about 500
2    pages of supervisory documentation regarding Plaintiff's
3    performance and conduct, and his e-mailing other, unspecified
4    employees on December 1, 2004, concerning his intention to give
5    the material to Plaintiff in order to permit her fully to
6    understand the concerns about her so that she could improve her
7    performance or alter her behavior. Plaintiff argues that this was
8    an admission by Fulnechek that he illegally compiled the
9    information, and she appears to contend that this warrants an
10   inference that her conduct was really a new issue that had never
11   been mentioned before. (Doc. 35 p. 13, ll. 7-25.) However, this
12   evidence post-dated the decision to provide Plaintiff with
13   additional training and supervision, and it likewise occurred
14   after the meeting of September 2004 in which Plaintiff was
15   informed of multiple problems concerning her mastery of the basic
16   skills of the VMO position for which she was then being trained.
17   The evidence does not warrant an inference of unlawful conduct on
18   the part of Dr. Fulnechek or an inference of retaliatory animus.

19   Plaintiff points to Exhibit 7A, a letter of October 3, 2003,
20   to Plaintiff from Corinne Nygren, Human Resources Specialist,
21   concerning Plaintiff's inquiry regarding her application for VMO
22   positions with announcement numbers 24-87-581 and 6-87-379-3. The
23   announcement number of the VMO position on the END Task Force was
24   24-87-581. (Ugstad Decl., Exh. C.) Thus, the letter pertains to
25   the position in question. In the letter, Nygren states:

26       As you are aware, you were found eligible for this position
         for both the case exam and merit promotion announcements,
27       and were referred out on both certificates. You were
         referred out on the case exam certificate with a score
28       of 97 points. Please keep in mind that the rating score

you received on this application and your placement on the
certificate is not reflective of every announcement
you may apply to in the future. Since each announcement
may require different specialized experience, and therefore
have a different rating plan, your score may very.

Your letter also asked us to inform you if this position
has already been filled. The electing official has made
tentative selections and has chosen applicants other
than you.

The precise significance of eligibility for the position in both
case exam and merit promotion announcements, and referral out on
both certificates, one with a score of 97 points, is not clear on
the face of the letter; it is uncertain what part of the process
is represented by the referral out on certificates or on a case
exam certificate, and it is not clear how many points were
possible. Plaintiff does allege that another applicant, Dr.
Smith, was hired with a score of 73, and a passing score for
hiring was 70. (Opp. p. 18, ll. 23-25.) Under the circumstances,
it may be inferred from this evidence that Plaintiff exhibited at
least some portion of the qualifications with respect to the two
positions.

Plaintiff also points to a letter dated July 6, 2004, from
Nygren to Plaintiff, with regard to her application for the END
Task Force position. The letter states in pertinent part:

As you are aware, you were found eligible for the
Veterinary Medical Officer position and were referred
out on the GS-12 certificate. It has recently come to
our attention that you did not receive adequate
consideration for the position, however, (sic)
we will be giving you priority consideration for
the next full-time GS-0701-12 position in California.
Please understand that this priority consideration
will only be given one time, and it will only be given
for a position of the same series, grade level,
promotion potential, tenure, and geographic location.
Although you will be given priority consideration,
please be aware that this does not guarantee selection
for the position for which you will be given the

1  consideration.

2  We apologize for any inconvenience this may have caused,
   and I encourage you to call me at 612-336-3235 if you
3  should have any questions regarding this matter.

4  (P's Exh. 7B.)

5      Although this letter indicates that there was some defect in

6  the consideration given Plaintiff for this position, it is not

7  clear to what inadequacy in consideration the letter refers. It

8  is so general that it is not clear what bearing on, or

9  relationship to, Plaintiff's qualifications the inadequate

10 consideration had or has. The universe of potential inadequacies

11 is so broad that the meaning and effect of this evidence is

12 unclear.

13     Plaintiff asserts that from September 17, 2004, through

14 February 17, 2005, "defendant" subjected Plaintiff to numerous

15 instances of retaliatory harassment, mental abuse, and ethnic

16 intimidation that are described in the report of investigation of

17 complaint 050129. (Doc. 35, p. 20, ll. 12-20.) The report of the

18 investigation is not before the Court. Plaintiff has not

19 presented evidence of any specific retaliatory conduct in this

20 regard.

21     Further, with respect to the qualifications that were

22 required for the job, Defendant submitted extensive and detailed

23 evidence that explains the context surrounding Plaintiff's

24 evidence. Reference to the vacancy announcement (D.'s Exh. C)

25 shows that the qualifications expressly required included 1)

26 specified educational accomplishments, 2) comprehension and

27 ability to communicate in the English language, 3) combinations

28 of experience and academic ability or education; and 4) specific

knowledge, skill and abilities (KSA's). (Exh. C, p. US 0086-97.) The announcement also states:

**BASIS OF RATING**
. . . .
Applicants meeting basic eligibility requirements will be rated and ranked on the knowledges (sic), skills and abilities and other characteristics (KSA's) required to perform the duties of the position. Please review KSA's carefully. Include in the write-ups such things as experience in and out of Federal service that gave you the specific knowledge, skill or ability; objectives of your work; and evidence of your success (such as accomplishments, awards received, etc.)

The announcement then lists specific requirements, such as ability to examine animals physically, recognize disease conditions using accepted diagnostic procedures, analyze data, and use computer program skills in communicating in writing in order to represent the agency to the public and private interest groups. The position required skill in verbal communication in order to present professional and scientific information and issues to diverse groups for the purpose of negotiating, gaining cooperation, and obtaining desired results. (Ex. C pp. US 00897-98.)

Defendant submitted specific evidence (Ugstad Decl., Ex. C, p. 1) that Plaintiff was not qualified for the position GS-0701-09/12 on the END Task Force for which she applied because she lacked required skills for communicating and interacting as well as an adequate understanding of poultry husbandry requirements and disease processes. The declarations of Ugstad and Shere, the position vacancy announcement, and the position description (Ugstad Decl., Exhs. C, D), warrant an inference that the job, the duties of which involved inspecting animals for disease, diagnosis and detection of causation, developing procedures to

1  deal with animals exposed to disease and related protocols,

2  advice to producers regarding treatment and preventive care, and

3  certifying the health of animals and their by-products to be

4  exported to other countries, required skill in communicating

5  verbally to present scientific and professional information and

6  issues to diverse groups for the purpose of negotiating, gaining

7  cooperation, and obtaining desired results; to represent the

8  agency before public and private livestock groups and individuals

9  to promote service programs in disease prevention and control; to

10 translate technical information and terms into language easily

11 understood by various consumers; and to explain and enforce

12 regulations and policy. A substantial part of the job was regular

13 community outreach meetings with groups of two to twenty people

14 regarding health emergencies, and effective communication of

15 complex, technical matters regarding END in many different

16 settings. (Id.)

17     Defendant submitted to this Court some of the supplemental

18 information submitted by Plaintiff in her application for the job

19 as evidence of her lack of skill in communicating. The materials

20 reflect awkward sentence structure and a lack of mastery of

21 English grammar and usage. (Ugstad Decl., Ex. E, page marked "US

22 00948.")[5] Further, Drs. Ugstad and Shere recounted their

23

24    [5] The Court notes that perusal of even a short portion of Plaintiff's opposition filed on August 17, 2009, further reflects limitations in written communication, such as elimination of articles (Opp., p. 2 ll. 5-6 ["With one

25 exception of issue regarding EEO complaint...."]); awkward usage (id. p. 2, l. 18 ["Defendant was well aware about that fact"]), p. 5, l. 16 "right for reconsideration"]; uncorrected errors (Opp. p. 3, l. 2 [Critical point is fact that

26 plaintiff timely filed her civil action complaint at the District Court, in contrary to defendant's erroneous claimed that she failed to bring lawsuit within thirty days...], id. p. 3 l. 8 ["Courts have been cleared that summary judgment is not

27 to be used as a...."], id. p. 8 l. 1 "the fact that job application of one selected candidate for 10 job opening", id. p. 8 ll. 8-9 ["...did defendant subjected Plaintiff to increased scrutiny"], id. p. 8 l. 15 ["Plaintiff demonstrated an inability

28 to effective responda"]; malapropisms ["creditability" in place of credibility], id. p. 3 l. 21; and lack of agreement between subject and verb, id. p. 5 l. 5 ["Plaintiff's objections to defendant's statement is fact that...."] ;

1 impressions of Plaintiff's abilities resulting from their

2 telephonic interview of Plaintiff on July 28, 2003, for the VMO

3 GS-12 position. The doctors evaluated all candidates for the

4 position on the END force based on their applications, knowledge,

5 skills, abilities, technical knowledge of poultry husbandry and

6 diseases, and references. (Shere Decl. ¶ 13, Ugstad Decl. ¶ 13.)

7 All applicants were evaluated pursuant to the same procedure with

8 the same questions in order to assess interpersonal and

9 communication skills as well as technical knowledge of poultry

10 husbandry and poultry diseases.

11     Ugstad observed Plaintiff's inability to communicate her

12 answers effectively, primarily because of limited English-

13 speaking skills. Plaintiff was difficult to understand, and her

14 answers were frequently not responsive to the questions in a way

15 that caused Ugstad to conclude that her comprehension of English

16 was limited as well. For example, she could not understand that

17 the location of the very position for which she was interviewing

18 was in southern California. Ugstad concluded that because it was

19 a struggle to communicate with Plaintiff in an interview, and

20 considering the limited skills demonstrated in her written

21 material as well, the Agency would have been disadvantaged in its

22 outreach efforts by hiring Plaintiff. Further, many of the

23 persons with whom Plaintiff would have to communicate in such a

24 position were native Spanish speakers. (Ugstad Decl. ¶¶ 13-14.)

25     Likewise, Dr. Shere noted the need for the VMO to translate

26 information into language easily understood by persons with

27 varying degrees of awareness of agency objectives, to engage in

28 regular community outreach, and to persuade responsible persons

or groups to observe the propriety of veterinary medical or program procedural adjustments and modifications. (Decl. ¶¶ 9-11.) In the telephonic interview, he found it difficult to understand Plaintiff's answers and needed to ask for clarification several times; further, Plaintiff was unable to answer basic questions about poultry. Finally, she was unaware of END. (Decl. ¶ 14.)

Both Ugstad and Shere declared that Plaintiff was not selected for the GS-12 level VMO position because of her lack of understanding of poultry husbandry and disease processes as well as inability effectively to communicate; it was not on the basis of her national origin. (Decls. ¶¶ 15.) The two candidates who were selected for the GS-12 level VMO position on the END Task Force were a Hispanic male with demonstrated experience with poultry diseases and extensive experience in community outreach by written and verbal communications, and a Caucasion male with demonstrated prior experience with the END Task Force and community outreach activities. (Decls. ¶¶ 16.)

Plaintiff also suffered from a lack of experience and knowledge regarding poultry and limited experience based on her resume, the interview, and all materials. (Ugstad Decl. ¶ 14.)

The Court concludes that Defendant has presented evidence that Plaintiff was not qualified for the position because of lack of ability and skills that are reasonably related to job performance, including the ability to communicate clearly and effectively and to comprehend the English language well, as well as knowledge of the pertinent veterinary subject matter and experience in the specific type of industry and position.

Although Plaintiff's national origin may bear some relationship to the level of her communication skills, it does not appear that it played any part in the non-selection of Plaintiff; rather, it was the inability to communicate effectively that was the determinative factor with respect to Plaintiff's language ability and skills. It appears without question that communication skills were reasonably related to job performance in this instance. It is established that an adverse employment decision may even be predicated upon an individual's accent when language skills are reasonably related to job performance and where the accent interferes materially with job performance. Fragante v. Honolulu, 888 F.2d 591, 596 (9th Cir. 1989) (noting the importance of carefully examining the circumstances in such a case, but finding no discrimination in the rejection of a Filipino applicant for a position as a clerk which required communication with contentious members of the public, including telephone conversations). Here, Defendant has produced evidence that demonstrates that Plaintiff suffered substantial inadequacies in communication skills in addition to her accent, and it further demonstrates that other skills and experience central to the job were missing from Plaintiff's qualifications.

Plaintiff has not submitted any evidence warranting an inference that the qualifications did not include these matters or that Plaintiff did have the necessary communication skills, knowledge, and experience. Plaintiff has not submitted evidence controverting the evidence that the doctors responsible for selecting the persons to hire found that Plaintiff lacked the necessary skills during the telephone interview and from a review

of her qualifications. She has not submitted evidence controverting the evidence that the persons hired had greater experience with poultry and outreach, knowledge of the disease processes in question, and ability to communicate.

Plaintiff asserts that similarly situated applicants who were outside the protected class were treated more favorably by being hired when their application ratings were inferior to Plaintiff's. For example, Dr. Smith, who was hired, scored 73, and 70 was a passing score for being hired. (Doc. 35, p. 18.) However, the declaration of Dr. Ugstad reflects that Dr. Layton Smith applied for a VMO position on the END Task Force and was hired for a GS-11 position. (Decl. ¶ 17.) The position Plaintiff sought was of a higher grade, namely, a GS-12 position. Thus, it does not appear that Dr. Smith was necessarily similarly situated or was treated more favorably.

Plaintiff's bare assertion that she was discriminated against on the basis of her national origin does not suffice to raise a disputed issue of fact concerning Plaintiff's lack of basic qualifications for the job. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). As was recently stated:

> A plaintiff may not defeat a defendant's motion for summary judgment merely by denying the credibility of the defendant's proffered reason for the challenged employment action. See Wallis, 26 F.3d at 890; Schuler v. Chronicle Broad. Co., 793 F.2d 1010, 1011 (9th Cir.1986). Nor may a plaintiff create a genuine issue of material fact by relying solely on the plaintiff's subjective belief that the challenged employment action was unnecessary or unwarranted. See Bradley v. Harcourt, Brace & Co., 104 F.3d 267, 270 (9th Cir.1996) (concluding, despite the plaintiff's claims that she had performed her job well, that "an employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact").

1  Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1029 (9th
2  Cir. 2006).

3      The Court concludes that Plaintiff has not submitted
4  evidence that demonstrates that she had the communication skills,
5  knowledge of poultry disease processes, or sufficient experience
6  with poultry and outreach to qualify for the specific position in
7  question.

8      However, if the Court were mistaken and Plaintiff in fact
9  made a prima facie showing of her qualifications for the
10 position, then the Court concludes that Plaintiff has not
11 submitted evidence sufficient to raise a disputed issue of
12 material fact regarding whether or not the employer's stated
13 reasons were pretextual.

14     The plaintiff is required to offer proof that the employer's
15 legitimate, nondiscriminatory reason is actually a pretext for
16 racial discrimination. Circumstantial evidence used to prove this
17 must be specific and substantial. Id., 439 F.3d at 1029 (citing
18 Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1222 (9th Cir.1998)).

19     Plaintiff has referred to reports of the investigation of
20 various EEO cases as evidence in support of her assertions. (See,
21 e.g., Doc. 35 p. 8, l. 3; p. 18, ll. 12-14; p. 20, l. 17; p. 23,
22 l. 25; p. 22, l. 12.) However, these reports are not before the
23 Court.

24     Plaintiff states that when she "contacted defendant for
25 explanation (sic) why she was not hired, defendant replied that
26 there were no monetary funds (sic) to fill advertised job
27 openings," but Defendant simultaneously continued to advertise to
28 fill the remaining six vacant positions and in fact gave a job to

30

all applicants that applied for positions and who had ratings
scores over 70, except to Plaintiff. (Doc 35, p. 19.) Plaintiff
also states, however, that she was not selected while the agency
kept six advertised positions "unfulfilled," which the Court
interprets as meaning "unfilled." (Id. p. 18 l. 22.)

It is unclear to what applicant or positions Plaintiff
refers. To the extent that Plaintiff is referring to the two
persons hired for the END Task Force, the evidence has already
been discussed. To the extent that Plaintiff is referring to
other candidates or hires, Plaintiff has not pointed to specific
evidence identifying the candidates or their qualifications.

Plaintiff states that when Plaintiff registered an informal
EEO complaint, Defendant sent her a letter of apology stating
that Defendant did not give Plaintiff appropriate consideration
and that Plaintiff would have priority consideration in a similar
job opening in the future; Defendant admitted wrongdoing with
apology and promised to make corrections in the future. (Doc. 36,
p. 19, Exh. 7A.) However, as noted above, this evidence is not
specific with respect to any basis for the conclusion that
consideration was inadequate. The declaration of Martha Gravagna,
lead human resources specialist of the USDA marketing and
regulatory programs, HR division, submitted by Defendant in
support of the reply, reflects Gravagna's declaration that she
directed Nygren to write the letter regarding the procedures for
the VMO-12 position. (Decl. ¶ 1-3.) The reference to the USDA's
not following proper procedures referred to the fact that
although Plaintiff was listed as a potential candidate on the
August 5, 2003 certification, other candidates were not included

1  in the list submitted to Drs. Shere and Ugstad, and therefore the
2  procedures for providing candidates to the selecting officials
3  were not followed. The reference to an absence of adequate
4  consideration did not relate to the interview procedure or any
5  assessments made by Drs. Shere and Ugstad when considering
6  Plaintiff on July 28, 2003. (Id. at ¶¶ 3-5.)

7      Plaintiff argues that the comparison Drs. Shere and Ugstad
8  made between her and other candidates was a violation of due
9  process because not made according to departmental standards.
10 Plaintiff provides no specific standards or procedures in support
11 of her assertion. As with her assertions about her
12 qualifications, an apology, and the alleged justification of a
13 lack of funds, Plaintiff has not submitted specific factual data.
14 Yet it is established that in responding to the moving party's
15 meeting its initial burden of showing, the nonmoving party must
16 go beyond the pleadings and by its own declarations or by other
17 evidence from the discovery process come forth with specific
18 facts to show that a genuine issue of material fact exists.
19 Hansen v. United States, 7 F.3d 137, 138 (9th Cir. 1993).

20     Plaintiff cites Cones v. Shalala, 199 F.3d 512 (D.C.Cir.
21 2000), in which the government's business justification for not
22 promoting an employee was sufficiently rebutted by evidence that
23 the alleged objective of filling the position with a lateral
24 transfer (instead of competitively advertising it) because of a
25 goal of downsizing was not supported by agency consideration of
26 whether the lateral transfer would aid its downsizing goal, and
27 further by evidence that the agency had promoted three white
28 employees to the higher position in the preceding ten months. As

Defendant notes, <u>Cones</u> may be distinguished because there the government conceded that the applicant was substantively qualified. 199 F.3d at 517.

Plaintiff alleged that she had worked in the same position as a VMO at level GS-701-11 with job duties that included daily oral and written communication with inspectors, plant management, and employees, with fully successful performance ratings; she successfully performed for three months her statutory duties as a relief veterinary medical officer without any complaints from USDA inspectors or slaughter plants officials. (Cmplt. ¶¶ 7, 10.) However, the position was at a different level from the position Plaintiff sought to obtain. Plaintiff has not provided evidence of her precise job duties at slaughter plants or her ratings while in this position.

The Court concludes that Plaintiff has failed to submit evidence that she possessed the necessary qualifications for the job, or, if she did establish her prima facie case, Defendant submitted evidence warranting a conclusion that the reason Plaintiff was not hired was because of a legitimate business decision regarding Plaintiff's lack of qualifications, and Plaintiff did not submit evidence warranting a reasonable trier of fact in concluding that the employer's stated reasons were pretextual.

V. <u>Retaliation Claim</u>

Defendant argues that Plaintiff cannot meet her burden of proving a causal link between her EEO activity and the employer's assignment of Plaintiff to additional training.

Title 42 U.S.C. § 2000e-3(a) provides that it shall be an

33

unlawful employment practice for an employer to discriminate against any of his employees or any applicant for employment because the person has opposed any practice made an unlawful employment practice by the statute, or because he or she has made a charge, testified, assisted, or participated in any manner in a covered investigation, proceeding, or hearing. Under Title VII, a plaintiff may establish a prima facie case of retaliation by showing that 1) plaintiff engaged in activity protected under Title VII, 2) the employer subjected the plaintiff to an adverse employment decision, and 3) there was a causal link between the protected activity and the employer's action. Passantino v. Johnson & Jonnson Consumer Products, Inc., 212 F.3d 493, 506 (9th Cir. 2000). The McDonnell Douglas burden-shifting framework applies in retaliation cases as well as in discrimination cases, pursuant to which the plaintiff must prove a prima facie case, the employer then has the burden of producing evidence and thereby to articulate a legitimate, non-retaliatory reason for the action taken, and the plaintiff must then prove that the employer's reason is a pretext for a discriminatory motive. Stegall v. Citadel Broadcasting Co., 350 F.3d 1061, 1065 (9th Cir. 2003).

To establish causation, the plaintiff must show by a preponderance of the evidence that engaging in the protected activity was one of the reasons for the action taken and that but for such protected activity, the person would not have been subjected to the action. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1064-65 (9th Cir. 2002); Kauffman v. Sidereal Corp., 695 F.2d 343, 345 (9th Cir. 1982).

The causal link may be established by an inference derived from circumstantial evidence, such as knowledge by the employer of the employee's protected activities plus the proximity in time between the protected action and the allegedly retaliatory employment decision. Jordan v. Clark, 847 F.2d 1368, 1376 (9th Cir. 1988). Where it is accepted that mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action is sufficient to establish a prima facie case of causality, the cases uniformly hold that the temporal proximity must be very close. Clark County School District v. Breeden, 532 U.S. 268, 273-74 (2001) (twenty months held too long, citing cases, including Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (9th Cir. 1997), in which it was held that a three-month period is insufficient to warrant an inference of causation). It has been held that although less than three months is sufficiently close, Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987), longer periods are too attenuated to support the inference, Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1065 (9th Cir. 2002) (eighteen months between the activity and the action); Cornwell v. Electra Central Credit Union, 439 F.3d 1018, 1036 (9th Cir. 2006) (eight-month gap between the employee's complaint about a superior's language and the employee's termination too long).

Here, Plaintiff's complaint EEOC complaint concerning her non-selection for the VMO position was filed on March 19, 2004. (Berg Decl., Ex. O.) Plaintiff alleged that after she registered a formal complaint of racial discrimination because of non-selection for the END Task Force position, then on September 17,

2004, Plaintiff was abruptly removed from her independent assignments at various slaughter plants and was put on retraining for the stated reason that she did not pass the training for the VMO that had started about three months earlier. (Cmplt. pp. 2-3.)

Plaintiff does not have any direct evidence of a causal connection between her EEO complaint and her assignment to retraining. Plaintiff apparently relies on the timing. However, the six-month period is not a reasonable period of time with respect to inferring a retaliatory intent. Likewise, any alleged retaliation that occurred later would not be sufficiently close in time to support an inference based on timing alone.

The Court notes that Defendant sets forth evidence warranting an inference that the reason for Plaintiff's retraining was because Plaintiff failed to complete satisfactorily the training process for development of the essential skills of an unsupervised relief public health veterinarian and had failed to demonstrate those skills.

According to Karlease Kelly, who in 2005 was the chief training officer for the USDA's learning division, and who in 2004 appeared to be the director of FSIS, Center of Learning (Decl. Kelly in support of Reply, ¶ 2, P.'s Ex. 5), the training in question was for a public health veterinarian (PHV); it covered regulations, statutes, and directives governing the job in a plant and was intended to help the PHV's use scientific background to enforce regulations. (¶ 3.) The training was nine weeks (from June 7, 2004, through August 6, 2004) and included an initial two-week classroom instruction period, a three-week

36

mentorship, and an additional four weeks of classroom
instruction. (Id.) Following the training, the trainees
completed, for a pass or fail grade, a post test, which covered
classroom instruction and technical and supervisory aspects of
training; they also were evaluated by their mentors in a
checklist format with a pass-fail in each category. (Id. ¶¶ 4-5.)

Following the classroom instruction, each participant was
provided with a certificate demonstrating attendance in the class
and the number of continuing education units received; the
certificate did not indicate that the participant successfully
passed the course exam or that all the conditions required for
employment as a PHV had been satisfied. Specifically, Plaintiff's
Exhibit 5, the certificate of training, is such a certificate,
and it does not indicate that she successfully passed the course
exam or that her mentors' assessments were satisfactory. (Id. at
¶ 5-6.)

Plaintiff's mentors and trainers declared that Plaintiff
exhibited a lack of ability to perform the fundamental or
critical skills of the job. Dr. Douglas L. Fulnechek, an
experienced trainer and supervising VMO in the Springdale FSIS,
served as Plaintiff's mentor in March through May 2004 and again
for a week during the PHV training. (Fulnechek Decl., ¶¶ 1-3.)
With respect to antemortem matters, Plaintiff failed adequately
to test and report common, visible conditions, and she failed to
understand the need to discuss her observations with plant
management, get additional information, or consult her
supervisor. Plaintiff did not understand the regulations
regarding humane handling. With respect to postmortem matters,

Plaintiff could complete the process but in her sixth week she failed to recognize and assess a common condition, make a proper disposition despite leading questions, and could not distinguish an exudate from a transudate. She also failed correctly to correlate with, or assess, the post mortem decisions of others; she made fundamental errors with assessing conditions that were present or absent. Plaintiff did not distinguish between an adulterant and a food safety hazard, did not readily recognize noncompliance or distinguish appropriate enforcement actions, or document noncompliance clearly, concisely, or in a legally defensible manner. Plaintiff was unable to distinguish feces from egg yolk remnants, and thus the mentor was not confident that Plaintiff could enforce the zero-tolerance feces policy. Plaintiff did not show that she could successfully interact with plant personnel, oversee finished product testing standards, or deal effectively with conduct or behavior problems. There was an inability openly to communicate with the inspection team. The final recommendation was that she did not demonstrate the ability to integrate complex, interrelated systems; she had been exposed to the fundamentals of the position but had not yet developed proficiency on performing the job; she would need close supervisory oversight and support; she had not demonstrated the ability to perform at the fully successful level as a PHV. (Decl. ¶¶ 7-9; Ex. F.)

Fulnechek stated that he was assigned to provide her additional training to remedy Plaintiff's performance deficiencies; at all times during his mentoring and training of Plaintiff, she was treated like all other vets participating in

the program and was evaluated on the standardized skills of a PHV

and measured in the same manner as all other PHV's; race,

national origin, and/or Plaintiff's prior EEO complaint were not

factors in the assessment of her proficiency in the skills

necessary to act as an unsupervised PHV. (Id. ¶¶ 10-13.)

Likewise, Plaintiff's other mentor, Jeffrey Sample, a PHV

and inspector in charge at the Simmons Food Plant, Jay, Oklahoma,

explained that the point of the two-week internship was to help

the interns apply the information they received in classroom

training with an emphasis on daily survival skills believed to be

necessary for successful job performance. He declared that in two

weeks of mentoring Plaintiff at the Simmons plant, he observed

that Plaintiff did not perform well; she lacked technical

expertise and managerial skills; on several occasions he told her

that he felt that she was not covering the necessary information

for her training; however, Plaintiff's behavior did not change.

He concluded that Plaintiff did not demonstrate proficiency in

the basic necessary skills and seemed to lack the ability to

implement her training in real life situations. She received a

negative evaluation in postmortem inspection, methodology, food

safety standards, sampling, plant management communication,

wellness and health and safety in the plant, water retention

issues, administrative and human resources duties, team

leadership and reviews, export certification, recalls, and

professionalism. He noted Plaintiff's poor attention span, slow

comprehension, and inability to develop a systematic thought

process and think through a situation. (Decl. ¶¶ 1-8, 11, Exs. F,

G.)

He also noted that during the entire mentoring process, he gave Plaintiff continual feedback about her performance, and Plaintiff was aware that there were significant problems with her performance. (Decl. ¶ 10.) He denied any discriminatory action; he was not aware of the specific topics or events involved in the EEO compliant, and his evaluation was based on Plaintiff's performance deficiencies during the mentoring phase of her training. He declared that his assessment was based on Plaintiff's skills, individual learning characteristics, and behavior. (Decl. ¶ 11-12.)

Karlease Kelly, a USDA trainer, became aware that Plaintiff had failed essential elements of her mentorship; thereafter, she directed staff to notify Dr. Marcia Endersby of the failures. (Decl. in Supp. of Mot., ¶ 6.)

Dr. Endersby, district manager of the Springdale district of the FSIS in 2004, declared that Plaintiff began working in March 2004 in the district as a relief public health veterinarian (RPHV), a position in which she provided relief coverage for PHV's who had to be absent. (Decl. ¶¶ 1-2, 4.) When it came to her attention that Plaintiff had failed a substantial portion of basic survival skills and yet was working without supervision, Endersby temporarily placed Plaintiff at a pork processing plant until a position could be created where Plaintiff would get additional necessary training; Plaintiff understood that it was a temporary assignment until creation of a position for her. A non-supervisory position was temporarily created at Dr. Fulnechek's assignment so that he, who was familiar with Plaintiff's training, could supervise Plaintiff and evaluate Plaintiff after

40

ninety days. (Decl. ¶¶ 6-7.)

On September 17, 2004, Plaintiff was informed in a performance evaluation counseling session of her deficiencies and was asked to complete additional training to develop skills. Dr. Endersby was the one who decided how to proceed, and Plaintiff was given an explanation of her skill deficits and the need for additional training. (Endersby Decl., ¶¶ 8-9; Nelson Decl., ¶¶ 1-4.)

A confirming letter with a warning that improvement must occur within ninety days was also sent on September 30, 2004. (Decl. of Marcia Endersby, ¶¶ 6-10, Exh. H.) Endersby denied that she discriminated against Plaintiff on any basis; Endersby had no knowledge of Plaintiff's prior EEO activity, and Endersby would have taken the same course of action with any other PHV in the district given the same set of facts. (Decl., ¶ 10.)

Plaintiff has not provided evidence to controvert the Defendant's evidence concerning Plaintiff's demonstrated lack of skill and knowledge during her training. Considering the evidentiary context, including the well-documented evidence of Plaintiff's lack of skills and Endersby's lack of knowledge of Plaintiff's protected activity, the period of time between Plaintiff's EEO complaint and her retraining is not sufficient to warrant a reasonable inference that the retraining was because of Plaintiff's EEO complaint.

Plaintiff's having a Ph.D. in pathology from the University of Tokyo is not sufficient to raise an issue of fact because the training and evaluation at issue in this action pertained to the application of knowledge and skills in a real-life situation

1  involving the responsibility of a supervising VMO; the fact of an

2  academic degree does not bear sufficiently on such activity to

3  raise an issue of fact. Plaintiff's subjective assertion that the

4  assessment of her abilities was "absurd," as discussed above, is

5  not sufficient to raise a genuine issue of disputed fact.

6      Plaintiff argues that the fact that she did not receive any

7  notice of her deficiencies between March and September

8  demonstrates retaliation. Even overlooking the fact that

9  Plaintiff's mentor did inform Plaintiff that she was not covering

10 sufficient material, the Court notes that the nine-week PHV

11 intern program began in June 2004 and continued through August 6,

12 2004. (Kelly Decl., ¶ 3.) Thereafter, the post-test was taken,

13 and then it was evaluated. (Id. ¶¶ 3-5.) By mid-September,

14 Plaintiff's deficiencies had come to the director's attention and

15 had been considered and evaluated, and a training arrangement and

16 a more supervised position were created. Given the tight time

17 line, it is not reasonable to infer that the failure to give

18 Plaintiff earlier notice of her deficiencies was evidence of

19 retaliation. Plaintiff was being trained, and the trainees were

20 not evaluated on a day-by-day basis, but rather were tested in

21 segments and then finally evaluated at the end. (Sample Decl., ¶

22 5.) Because of the type of training and the process of

23 evaluation, a reasonable trier could not infer from this process

24 that there was a significant delay or a delay that reflected

25 retaliatory animus.

26     In view of Kelly's declaration concerning the significance

27 of the training certificate (Ex. 5), the certificate is not

28 sufficient to raise a genuine issue of fact because it does not

constitute a statement of success or mastery of the matters covered in the training program; rather, it refers to attendance and continuing education units.

Plaintiff's list of personnel actions (Pltf.'s Ex. 7C) is not a sworn document and has no evidentiary value. Plaintiff's list of accomplishments educationally (Pltf.'s Ex. 7D) also does not relate to the particular type of applied training and specific skills sufficiently to raise an issue of material fact.

Plaintiff's assertions that the training records were falsified or were proved to have been falsified are not supported by any specific factual allegations and thus do not raise a genuine issue of fact.

Plaintiff asserts that she was the victim of further retaliation when she was wrongfully terminated on or about February 17, 2005, based on allegations that she committed misconduct concerning a 911 call she made to police regarding the alleged misbehavior of her supervisor, Dr. Fulnechek, and that she allegedly removed from the work site an agency file concerning her employment. Plaintiff submits evidence contradicting the employer's version of the events at the time of termination and tending to show that contrary to the employer's assertion, Plaintiff did not remove the file or claim during the 911 call that Dr. Fulnechek had Plaintiff in a choke hold.

The evidence concerning Plaintiff's termination, which occurred five months after the September meeting at which Plaintiff was assigned to further training and supervision, and which was apparently related to issues other than Plaintiff's mere training or performance of the basic survival skills of a

43

1  VMO, does not warrant an inference that there was a connection
2  between Plaintiff's assignment to further training in September
3  2004 and Plaintiff's activity of making an EEO complaint in March
4  2004. Further, the Court notes again that the merits of
5  Plaintiff's claim that she was wrongfully terminated are not
6  presently before the Court.

7      The Court concludes that Defendant has submitted evidence
8  warranting an inference that Plaintiff was assigned to additional
9  training because she had failed to complete successfully and
10 master substantial portions of the earlier training. Plaintiff
11 has failed to submit evidence sufficient to raise a genuine issue
12 of material fact concerning the reason or reasons for Plaintiff's
13 being assigned to additional training. The Court concludes that
14 Plaintiff cannot meet her burden of proving a causal link between
15 her EEO activity and the employer's assignment of Plaintiff to
16 additional training.

17     Accordingly, Defendant is entitled to judgment on
18 Plaintiff's retaliation claim concerning her assignment to
19 additional training.

20     VI. Privacy Act Claim

21     Plaintiff seeks damages for alleged violations of the
22 Privacy Act of 1974. She alleged that on March 3 and 6, 2006, an
23 agency representative faxed to Plaintiff's EEO representative's
24 office some records, including medical records and MSPB
25 documents, while he was out of town, resulting in irreparable
26 damage to Plaintiff because numerous agency employees had the
27 chance to see the documents. (Cmplt. p. 6.) The evidence reflects
28 that a nineteen-page facsimile of the agency's pre-hearing

44

statement was sent from James Varsalone, representing the USDA, to Dr. Muller, Plaintiff's representative, at Dr. Muller's place of employment on March 3, 2009. (Berg Decl., Ex. K.) The document reflects that it was marked "urgent" and was submitted in accordance with an order dated January 12, 2006. (Id.) In the document, Plaintiff's complaint that her additional retraining and conduct thereafter[6] was due to race (Asian) and national origin discrimination (Thailand). The pre-hearing statement set forth positions of the agency with respect to the issues raised in the complaint.[7] There were no references to medical records or conditions. What appears to be a note from a "Kim" to Dr. Muller dated March 3, 2006, is placed over the first page of the received fax in which Kim states she did not know if the fax was complete because it looked like there were a couple of tries; Kim had called the sender, Mr. Varsalone, that afternoon and had left him a message that Dr. Muller would be in the office on Monday. (Ex. K.)

A second facsimile transmission of the prehearing statement from Varsalone to Muller occurred on March 6, 2006. (Berg Decl., Ex. J.)

Plaintiff stated initially in her opposition that the faxes occurred in 2004 (Doc. 35, p. 14, l. 19), but exhibits (Pltf.'s

---

[6] The later conduct was alleged to include an inspector's hitting her on her head and a supervisor's saying that she would be fired because she was mentally sick like a former employee who had been fired, accompanied by his asking her to make a photograph of the former employee.

[7] It was argued that Plaintiff failed to state a claim in connection with the performance improvement plant, and the single instance of the supervisor's conduct was insufficient to constitute harassment or hostile work environment. A sworn declaration of the inspector and hearing testimony controverted Plaintiff's assertion that she was hit; and her discharge based on improper conduct had been affirmed.

Ex. 8) indicate that it was in 2006 that the incidents occurred. Exhibit 8 includes a copy of a document faxed to Varsalone by Miloslav Muller on February 16, 2006, indicating that Muller would be on travel status for the entire week in which February 28 fell but would be back in New Mexico for the rest of March 2006.

At deposition, Plaintiff testified that the faxes did not contain any confidential medical records, although the MSPB materials did refer to the MSPB proceeding. (Dep. p. 272, 277.) She further testified that she did not know if anyone in Dr. Muller's office besides Dr. Muller actually read the faxes. (Dep. pp. 269, 274-76.) She did not know what arrangement had been made between Dr. Muller and Mr. Varsalone regarding sending the document over the facsimile. (Dep. p. 270.) She did not know if the records were intentionally sent by Mr. Varsalone to Dr. Muller or not. (Dep. pp. 276, 278.) The damage she suffered was to her reputation. (Dep. p. 280.)

Mr. Varsalone, the attorney who represented the agency in the MSPB/EEO proceedings, faxed the records to Dr. Muller. Varsalone declared that in handling Plaintiff's MSPB claim, Dr. Muller had faxed a motion to compel to Varsalone pursuant to an agreement between the two that documents and pleadings could be faxed. (Decl., ¶ 5, Exh. L.) In handling the EEOC claim number 050129 (the pertinent claim), Varsalone had reached an agreement with Dr. Muller that documents relating to the matter, including pleadings, could be sent via facsimile; consistent with this understanding, Dr. Muller submitted Plaintiff's supplemental complaint via facsimile on or about August 30, 2005. (Decl. ¶ 6,

46

1  Ex. M.) Varsalone prepared the agency's pre-hearing statement
2  (Berg Decl., Exs. J, K) without input from Plaintiff's
3  representative and then sent it to Muller on March 3 and 6, 2006,
4  because it was understood by Varsalone that an agreement had been
5  reached to permit the documents to be sent via facsimile. There
6  was no intent to disclose any personal or private information;
7  rather, the intent was to provide the document in furtherance of
8  the proceedings. (Decl. of Varsalone, ¶ 8-11.) A confidential tag
9  was on the initial page of the document, and the fax was
10  addressed to Muller personally. (Berg Decl., Exh. J.) Varsalone
11  noted that thereafter, Dr. Muller served a response to an order
12  to show cause via facsimile on Varsalone on July 28, 2006. (Decl.
13  ¶ 11, Exh. N.)

14      Documents concerning treatment of information concerning
15  another employee are submitted by Plaintiff but are not helpful
16  because the context concerning the treatment of these documents
17  is not clear, the circumstances do not appear to be similar, and
18  there is no relationship between the claims of Plaintiff and
19  those of the other employee.

20      Title 5 U.S.C. § 552a(b) provides that no agency shall
21  disclose any record which is contained in a system of records by
22  any means of communication to any person, or to another agency,
23  except pursuant to a written request by, or with the prior
24  written consent of, the individual to whom the record pertains.
25  Section 552a(g)(4) provides that whenever any agency fails to
26  comply with the privacy provisions in a way that has an adverse
27  effect on an individual, then the person may bring a civil action
28  against the agency in the district court and, if the court

1   determines that the agency acted in a manner that was intentional

2   or willful, the United States shall be liable to the person for

3   actual damages, not less than $1,000, and costs and fees.

4       Here, the evidence does not warrant an inference that

5   Plaintiff was damaged or suffered any adverse effect in any

6   respect.

7       Further, among other elements,[8] this statute requires a

8   showing of intentional or wilful conduct, such that the agency

9   committed the act without grounds for believing it to be lawful

10  or flagrantly disregarding other's rights under the Act. <u>Covert</u>

11  <u>v. Harrington</u>, 876 F.2d 751, 757 (9th Cir. 1989).

12      Here, Plaintiff's own representative, who had acted and was

13  acting on her behalf, had agreed to the communication of

14  documents by facsimile, and that agreement was documented by the

15  exchange of materials by facsimile. In light of the two

16  representatives' established practice of communicating by

17  facsimile in such a fashion, a reasonable trier of fact would not

18  infer that the act was committed without a belief in its

19  lawfulness or in flagrant disregard of Plaintiff's rights. The

20  fact that service might also have been effected by mail or that

21  the facsimile transmission process might have been carried out

22  with greater concern for privacy pursuant to applicable

23  guidelines does not warrant a contrary inference in view of the

24  uncontradicted evidence of the understanding between the

25  representatives and the course of conduct in the pertinent

26

27          [8] The elements of a claim are 1) the disclosed information is a record contained within a system of records;
28  2) the agency improperly disclosed the information; 3) the disclosure was intentional or wilful; and 4) the disclosure
    adversely affected the plaintiff. <u>Logan v. Dept. of Veterans Affairs</u>, 357 F.Supp.2d 149, 154 (D.D.C. 2004).

1    proceedings.

2        The Court concludes that Defendant has shown that it is
3    entitled to judgment on Plaintiff's claim concerning violations
4    of the Privacy Act.

5        VII. Disposition

6        By this motion, Defendant sought to have the Court enter
7    judgment for Defendant on all claims alleged by Plaintiff.

8        Fed. R. Civ. P. 56(b) provides in pertinent part that "a
9    party against whom relief is sought may move at any time... for
10   summary judgment on all or part of the claim." Although a motion
11   for partial relief is commonly referred to as a motion for
12   "partial summary judgment," the term is a misnomer where a
13   judgment is not entered if the moving party prevails; instead, a
14   ruling on such a motion would be interlocutory in effect. Diamond
15   Door Company v. Lane-Stanton Lumber Co., 505 F.2d 1199, 1202 (9th
16   Cir. 1974). Therefore, the procedure is more accurately described
17   as a summary adjudication of the particular claims for relief.
18   Fed. R. Civ. Proc. 56(d) advisory committee's note, 1946
19   Amendment. Although such a motion is commonly referred to as a
20   motion for "partial summary judgment," the term is a misnomer
21   where a judgment is not entered if the moving party prevails;
22   instead, a ruling on such a motion would be interlocutory in
23   effect. Diamond Door Company v. Lane-Stanton Lumber Co., 505 F.2d
24   1199, 1202 (9th Cir. 1974). Therefore, the procedure is more
25   accurately described as a summary adjudication of the particular
26   claims for relief. Fed. R. Civ. Proc. 56(d) advisory committee's
27   note, 1946 Amendment.

28       Accordingly, it IS ORDERED that

                              49

1     1) Defendant's motion for summary judgment or, in the
2 alternative, summary adjudication, is granted in part and denied
3 in part; and

4     2) Defendant HAS ESTABLISHED that Defendant is entitled to
5 judgment on Plaintiff's claim concerning non-selection for a FSIS
6 position in 2002, and the claim IS SUMMARILY ADJUDICATED in
7 Defendant's favor; and

8     3) Defendant HAS ESTABLISHED that Defendant is entitled to
9 judgment on Plaintiff's claim that the failure to select her for
10 the position of VMO-12 on the END task force was discriminatory,
11 and the claim IS SUMMARILY ADJUDICATED in Defendant's favor; and

12     4) Defendant HAS ESTABLISHED that Defendant is entitled to
13 judgment on Plaintiff's claim that her assignment to additional
14 training was retaliatory, and the claim IS SUMMARILY ADJUDICATED
15 in Defendant's favor; and

16     5) Defendant HAS ESTABLISHED that it is entitled to judgment
17 on Plaintiff's claim concerning violations of the Privacy Act,
18 and the claim IS SUMMARILY ADJUDICATED in Defendant's favor; and

19     6) Defendant HAS NOT ESTABLISHED that Plaintiff's complaint
20 concerning her allegedly wrongful or discriminatory termination
21 was untimely or that Defendant is entitled to judgment on that
22 claim; therefore, Defendant's motion for summary judgment and/or
23 adjudication on Plaintiff's claim concerning her termination IS
24 DENIED.

25 IT IS SO ORDERED.

26 **Dated:    November 12, 2009**       **/s/ Sandra M. Snyder**
                                   UNITED STATES MAGISTRATE JUDGE

27

28