1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9    TIPAKSORN TUNGJUNYATHAM,                CASE NO. 1:06-cv-01764-SMS

10                        Plaintiff,
                                              ORDER GRANTING DEFENDANT'S
11        v.                                   MOTION FOR SUMMARY JUDGMENT

12   MIKE JOHANNS, Secretary of the United
     States Department of Agriculture,
13                                            (Doc. 49)
                         Defendant.
14   _____/

15
16         Defendant Mike Johanns, Secretary of the U.S. Department of Agriculture ("USDA"),

17   moves for summary judgment on the single issue remaining in this case: wrongful termination.

18   Having reviewed the parties' briefs and applicable law, this Court now grants Defendant's

19   motion for summary judgment.

20   **I.      Factual and Procedural Background**

21         Plaintiff Tipaksorn Tungjunyatham is an Asian Pacific woman who was born in Thailand.

22   USDA's Food and Safety Inspection Service hired Plaintiff as a veterinarian in May 2002 and

23   assigned her to red meat inspection in California.  In March 2004, Plaintiff was promoted to the

24   position of Relief Public Health Veterinarian ("RPHV"),[1] a position in which she would be

25   expected to temporarily fill in for veterinarians during their absences from permanent

26
27
28
     _____

     [1]  Elsewhere in the record, Plaintiff's position is referred to as Supervisory Veterinary Medical Officer.

1   assignments at chicken slaughter houses and processing plants.[2]   The notification of personnel

2   action reflected that Plaintiff's work performance was acceptable prior to the promotion.

3   Plaintiff has also provided evidence of various honors and awards she received while working as

4   an inspector in California.

5       Before working independently, Public Health Veterinarians ("PHV") attend a nine-week

6   program that includes a job orientation program and participation in an internship.  Dr. Douglas

7   Fulnechek (stationed in Springdale, Arkansas) and Dr. Jeffrey Sample (stationed in Jay,

8   Oklahoma) were assigned to be mentors to Plaintiff during her training.  Plaintiff spent several

9   weeks working under the direction of each mentor.  Fulnechek's and Sample's evaluations of

10  Plaintiff during the course of her training reported that Plaintiff neither met the standardized

11  requirements for an RPHV nor demonstrated proficiency in fundamental job procedures.  For

12  example, Fulnechek reported that, although Plaintiff could perform the physical activity of

13  poultry antemortem inspection, she failed to demonstrate an understanding of applicable

14  purposes and policies, and did not recognize the necessity of communication of certain findings

15  to plant management and her superiors.   According to Fulnechek's evaluation, Plaintiff failed to

16  demonstrate the ability to address incidents of workplace violence and sexual harassment.  He

17  summarized:

18          [Plaintiff] did not demonstrate the ability to integrate complex interrelated
19          systems.  She was exposed to the fundamentals of the position, but has not yet
            demonstrated proficiency in performing the job.  She will need very close
20          supervisory oversight and support.

21      Sample reported that he had been unable to complete the necessary material with Plaintiff

22  due to certain personal characteristics.  For example, Plaintiff was disinterested in various

23  presentations, wandering away to pursue her own agenda and avoiding opportunities to interact

24  with plant management.  Her poor attention level complicated Sample's ability to assess whether

25  she had mastered a concept; her comprehension was slow.  Sample described Plaintiff as being

26  able to memorize facts but unable to draw together multiple facts or pieces of information to a

27      [2]  Plaintiff had previously been denied promotions to several positions in California, resulting in her filing
28  an EEO complaint for discrimination.  The Commission found no illegal discrimination, finding that Plaintiff lacked
    sufficient English literacy to perform the positions in question.

1   reasoned conclusion.  She seemed to lack an understanding of her job duties and how to perform

2   them.  Summarizing his findings that Plaintiff had not mastered the basic survival skills, Sample

3   wrote: "The Intern was exposed to a bulk of the material.  The comprehension is questionable."

4          Plaintiff contends that the following statement in Sample's evaluation is insulting and

5   constitutes ethnic stereotyping:

6          Another characteristic she exhibited that really concerned me was what seemed to
       be an inability to develop a systematic thought process . . . . . I believe it will
7          require someone in a role other than a mentor to change her mind set.

8   Plaintiff states, "Dr. Sample wrote this insulting statement about me (a person who earned PhD

9   degree in veterinary pathology at University of Tokyo, and Masters Degree in Preventive

10  Medicine at University of California, Davis)."  She notes that she achieved a high score on the

11  written test following the classroom portion of the training.

12         On August 6, 2004, Plaintiff received a U.S.D.A. Certificate of Training, certifying that

13  she has "satisfactorily completed [the] PHV Training Program," earning 18.2 continuing

14  education credits.

15         Because Plaintiff failed to perform a majority of the skills essential for a PHV, the agency

16  determined that Plaintiff would require additional training before she could be assigned an

17  RPHV position.  At the Springdale District Office on September 17, 2004, Dr. Marcia Endersby,

18  the FSIS District Manager, and Ms. Suzanne Nelsen, a resource management analyst, conducted

19  performance evaluation counseling for Plaintiff, at which they advised her that her marginal

20  performance bordered on unsatisfactory.  Areas of failure included ante-mortem inspection;

21  humane handling; postmortem inspection; 5000.1 methodology; food safety standards for feces,

22  ingesta, milk (red meat), and feces (poultry); plant management communication; labor

23  management agreement; OCP verification; wellness, health and safety; water retention issues;

24  administrative; human resources and administrative duties; IPPS reviews; and team leadership.

25  Endersby expressed particular concern about Plaintiff's ability to lead an inspection team and to

26  communicate with management.  Pursuant to agency policy, FSIS hoped to retain Plaintiff's

27  experience by assigning her to additional training under Fulnechek at George's Inc., a chicken

28  slaughterhouse in Springdale, Arkansas.

Plaintiff disputes evidence demonstrating her failure to demonstrate proficiency during the training process, claiming her performance was satisfactory and that she was never advised of any deficiencies during the course of her training.  Although Plaintiff concedes that both Fulnechek and Sample claimed that she needed more training, she contends that Fulnechek never claimed her performance was deficient until long after her training was completed.  Plaintiff maintains that Endersby said her performance was "bordering on unsatisfactory," which she contends is "still satisfactory."  She also contends that the elapsed time between the end of her training, at which she received a certificate of completion, and the September 14, 2005 conference, was inappropriately long, indicating that the decision to require additional training was a pretext for prejudicial treatment.

Plaintiff maintains that the decision to extend her training rather than permit her to proceed was based on intervening events.  She points out that, following the end of the formal training program, she completed assignments as a "relief VMO" in Siloam Springs and Guymon.  Then, on September 10, 13, and 15, Plaintiff's EEO representative had four telephone conferences with Defendant's attorney regarding information that Plaintiff's representative had requested regarding Plaintiff's EEO complaint, triggering the requirement of additional training.

On September 24, 2004, when she began the additional training, Plaintiff received and initialed a written memorandum outlining the standards of conduct for FSIS employees.  Among other things, the memorandum emphasized the importance of FSIS workers' maintaining a professional relationship with co-workers as a means of reinforcing FSIS's integrity and credibility, and set forth a no-tolerance policy for inflammatory language, which it characterized as an unacceptable substitute for physical aggression.  Fulnechek also provided Plaintiff with excerpts from FSIS Directive 4735.7, setting forth FSIS's relationship principles. and FSIS Directive 4735.3, emphasizing employee responsibilities and conduct.  The Directives provided that proper performance of government business and citizens' maintenance of confidence in government depended on employee's maintaining "unusually high standards of honesty, integrity, impartiality, and conduct."  Plaintiff acknowledges that she received these publications and maintains that she never violated them.

On November 30, 2004, after Plaintiff had an outburst in the lunchroom, Fulnechek advised Plaintiff that her outburst was unacceptable behavior that should not be repeated. Plaintiff denies that she ever made an improper outburst or received counseling for it.

On December 9, 2004, Plaintiff filled a prescription for Alprazolam, a benzodiazepine used to treat anxiety and panic disorder.

On Monday, February 14, 2005, Fulnechek sent Plaintiff home because her emotions were out of control and she was incapable of performing her duties.  Sobbing, Plaintiff pleaded not to be placed on a performance improvement plan, claiming lack of sleep and homesickness. She told Fulnechek that she had left California to get away from people who were lying, but they had followed her to Arkansas.  Plaintiff did not want to go home because she did not want to use up her leave time.  When Plaintiff was still incoherent after 45 minutes, Fulnechek sent her home on administrative leave.  Fulnechek did not discipline Plaintiff, characterizing his actions as "counseling," but warned Plaintiff that any further occurrence of similar behavior would require him to take disciplinary action.  In an e-mail responding to Fulnechek's written report of the incident, Plaintiff characterized her behavior as "situational anxiety."

On February 16, 2005, Plaintiff met with Fulnechek and co-workers, Sharon Crooks, a consumer safety inspector, and Morris Nations, a supervisory consumer safety inspector, to discuss proper conduct of outside premises inspections.  In the course of the meeting, Plaintiff became agitated that, instead of giving her the answers, Fulnechek directed her to consult the regulations.  She accused him of trying to trick her.  Crooks recalled Plaintiff's repeatedly changing the subject, at one point stating that she wrote Crooks up because Crooks did not perform tests like Nations and another inspector, and needed more practice.  After Crooks stated that she understood how to properly calibrate her thermometer and that multiple methods of testing were equally correct, Plaintiff shouted at Crooks, "You lie,  You are lying!"  Fulnechek again reprimanded Plaintiff, explaining that her accusations against Crooks were improper conduct by a supervisor.

As the discussion grew heated, Nations moved to close the door and stand in front of the door's window to prevent persons in the adjacent lunchroom from witnessing the exchange.

After Fulnechek advised Plaintiff that her conduct was inappropriate and directed her to apologize to Crooks, Plaintiff shouted, "No!" rose from her chair, pushed Nations out of the way with two hands, and flung open the door, striking Nations. She then stepped into the lunch room, which was occupied by both resident and visiting inspectors, and shouted, "Help me . . .Save me . . . Dr. Fulnechek is policing me again!" When Fulnechek came out to tell Plaintiff her behavior was inappropriate, she stormed off to the women's rest room.

Plaintiff maintains that Crooks failed to tell the truth, but denied that she called Crooks a liar. According to Plaintiff, only Fulnechek used inflammatory language.

On the morning of February 17, 2005, Fulnechek left his office briefly. When he returned, he realized that the personnel file in which he kept his notes on Plaintiff was missing from an unlocked file drawer in his office.[3] Fulnechek called Plaintiff to his office and, in the presence of Crooks and Nations, asked her whether she knew the location of her folder. After first accusing Nations or Crooks of having taken the folder, Plaintiff replied that she had taken the folder and would exchange it for her formal personnel folder ("the bigger file containing all the lies [Fulnechek] wrote about her"). Plaintiff then told Fulnechek that she took the folder but no longer had the folder, saying first that she given it to her attorney, and later said that she had given it to the police.

Plaintiff denies that she ever took the folder or confessed to having it. She maintains that she had no reason to take the folder since she was given a copy of her personnel folder in December 2004. She adds that the 500-page folder would not have fit under a locker.[4]

In Plaintiff's presence, Fulnechek called Endersby by speaker phone and explained the situation. Plaintiff denied having the folder. Endersby directed Plaintiff to return the folder, directed Fulnechek to put Plaintiff on administrative leave if she did not return the folder, and added that if Plaintiff refused to leave the premises, Fulnechek should contact plant security to

---

[3] Later, Inspector Rebecca Patlan-Garcia reported that she had seen Plaintiff leave Fulnechek's office with a file folder, saying, "I have a right to this file. It is mine."

[4] Plaintiff appears to refer to her formal personnel file, a 500-page folder kept in a locked file, while Fulnechek apparently refers to a smaller, personal file containing his notes as her mentor that he did not keep in the locked file.

1  escort Plaintiff from the plant.  Plaintiff told Endersby that she was sick and requested to be put

2  on sick leave.  (Nelsen recalled that Plaintiff was yelling so loudly during the telephone

3  conference that Fulnechek commented that he could not hear Endersby speaking.)  Fulnechek

4  then prepared a written order directing Plaintiff to return the folder.

5       At 10:04 a.m., Plaintiff called local police via "911," requesting help because her

6  supervisor had her in a submission hold.  Plaintiff hung up before police could obtain full

7  information.  When police officers arrived at the plant, human resources personnel explained the

8  ongoing disagreement.  After officers spoke with her for fifteen minutes, Plaintiff confirmed that

9  she had not been touched but complained that her supervisor was looking for a reason to fire her.

10      Plaintiff concedes that Fulnechek never touched her but denies having told local police

11  that Fulnechek had her in a submission hold, claiming that the taped conversation she attempted

12  to introduce into evidence in the administrative hearings supports her position.[5]  Plaintiff denies

13  that Endersby was a party to any conversation between Plaintiff and Fulnechek, dismissing

14  Endersby's declaration as "hearsay."

15      Fenechek directed Plaintiff to gather her belongings and leave the plant, but Plaintiff

16  refused.  Ultimately, Plaintiff was escorted to her car by two plant security officers, who

17  observed Plaintiff linger in the parking lot before finally leaving a short time later.

18      After Plaintiff left, Fulnechek and other personnel searched the offices for the folder,

19  ultimately concentrating on the women's rest room since Crooks recalled that Plaintiff had been

20  in the rest room repeatedly flushing the toilet.  An employee of George's, Inc., who had stopped

21  by to speak with Fulnechek, joined the search and found the file hidden beneath a basket under

22  the lockers.  Plaintiff maintains that a 500-page file could not fit under the lockers.

23      On February 23, 2005, Fulnechek filed his report of Plaintiff's misconduct, including

24  reports of the incidents on November 30, 2004; February 16, 2005; and February 17, 2005.

25  Plaintiff concedes that Fulnechek made this report but contends that its contents are false.

26

27      [5]  The disc on which the conversation was allegedly recorded was "authenticated" below only by Plaintiff's
28  own statement claiming that it was a copy of the 911 call.

1    Endersby referred the matter to the Chief of the Employee Relations Branch for

2    investigation.  Following an independent investigation, Dawn Ruffner, a Senior Employee

3    Relations Specialist, sent Plaintiff a Notice of Proposed Removal based on six instances of

4    misconduct.  These included Plaintiff's removing her personnel file without authorization

5    (February 17, 2005); refusing to return her personnel file and making false statements regarding

6    its location (February 17, 2005); making false statements to the local police department

7    (February 17, 2005); physically assaulting Nations (February 16, 2005); and verbally assaulting

8    Crooks (February 16, 2005).

9    Plaintiff, represented by an attorney, contested her removal, denying most of the

10   specifications relevant to the six incidents of misconduct.  She contended, among other things,

11   that Fulnechek fabricated the incidents and that Nations was untruthful.  She denied ever having

12   been counseled about her behavior.  The Administrative Judge found Plaintiff's testimony not

13   credible.

14   Ultimately, Kristie Kelm, Chief of the Employee Relations Bureau, determined that

15   Plaintiff's actions warranted removal.  Kelm concluded that Plaintiff could not effectively carry

16   out the duties of an RPHV since filing a false police report seriously compromised FSIS's mission

17   and regulations; Plaintiff's misconduct violated the requirements of Directive 4735.3 that

18   employees be honest, trustworthy, and compliant with instructions; and that Plaintiff's conduct

19   was an abuse of her position that adversely impacted her ability to perform her duties.

20   Plaintiff acknowledges the decision but contends that the conclusions were incorrect.  She

21   rejects the agency's decision as mere legal conclusions. Plaintiff maintains that she intended to

22   remedy the claimed performance deficiencies and satisfactorily perform her work as a RPHV.

23   Plaintiff contends that the agency failed to ever consider her claims of medical discrimination.

24   She challenges the agency's conclusion that she failed to provide evidence supporting her

25   position, claiming that the USDA never asked her for more information.

26   In their declarations to this Court, Endersby, Fulnechek, and Grievance Examiner Dawn

27   Ruffner denied ever making any statement regarding Plaintiff's ethnic or national origin, and

28

denied any knowledge of her prior EEO complaints.  Sample stated Plaintiff's prior EEO activity

had no bearing on his evaluation of her performance.  Kelm stated that Plaintiff's prior EEO

activity played no role in her removal.  In her deposition on May 1, 2009, Plaintiff avoided

questions relating to her supervisors' and co-workers' references to her race or ethnicity.

Q.      Now Dr. Fulnechek never made any comments or statements about your
        ethnic origin; is that correct?

A.      I could not recall at this moment.

Q.      Dr. Sample never made any comments about your national origin; is that
        correct?

A.      I could not recall at this moment.

Q.      Dr. Endersby never made any comments about your national origin; is that
        correct?

A.      I don't recall at this moment.

Q.      Dr. Fulnechek never made any comments about your race; is that correct?

A.      I recall later.

Q.      When did he say that?  When did–what–Dr. Fulnechek said something
        about your race?

A.      About my Thailand, and also looked down on my Thailand education.  But
        I can say it, as I recall that I answer him back about he insulted me about
        why Ph.D. cannot answer the regulations of poultry inspection.  I said my
        Ph.D. was in rabies immunohistochemistry.

Plaintiff maintains that this final response in her deposition is sufficient to prove that

Fulnechek made derogatory comments about Plaintiff's national origin.

Plaintiff appealed her removal to the Merit Systems Protection Board, which upheld the

removal as nondiscriminatory.  After exhausting her administrative appeals, on December 7,

2006, Plaintiff, proceeding *pro se*, filed her complaint with this Court, claiming unlawful

discrimination in violation of Title VII of the Civil Rights Act, wrongful termination, violation of

privacy, and civil rights conspiracy.  On November 13, 2009, this Court granted in part, and denied in part, Defendant's motion for summary judgment.  Because the Court concluded that the statute of limitations did not bar Plaintiff's claim of wrongful termination, that claim alone remained in the case.  Following the Court's grant of Defendant's leave to file a second motion for summary judgment, Defendant brought this motion on April 20, 2010.

Plaintiff asserts that she received positive evaluations in the USDA position she held prior to her promotion to RPHV; that she requested but was denied the opportunity to demonstrate her competence to a mentor other than Fulnechek; that she made no improper outburst on December 1, 2004; that, in December 2004, she requested VDIP between herself and Fulnechek; that Fulnechek threatened her by providing a floppy disk of a former employee named Sharon Harrop, who had been discharged as a result of her mental illness, and likening Plaintiff's situational anxiety to Harrop's mental illness; that Fulnechek improperly denied Plaintiff sick leave on February 14, 2004 [*sic*]; that Defendant never counseled Plaintiff regarding her right to take leave under FMLA; that Plaintiff's inability to function resulted from the pressure that Fulnechek placed on her; that USDA supervisors failed to respond to her requests for medical accommodation; that Plaintiff understood that she could not be terminated except for good cause; that the agency erred in failing to listen to the 911 recording that she provided; that Fulnechek was aware of Plaintiff's EEO complaints; and that Plaintiff had no negative performance reviews before she filed her EEO complaints.

## II.    **Plaintiff's New Claims**

For the first time in her responsive brief, Plaintiff contends that, on February 14, 2004, Defendant refused to provide Plaintiff with sick leave for an unspecified "severe medical condition,"[6] that Defendant failed to provide accommodations for her condition, and that

---

6  Plaintiff includes with her brief documentation of an October 2004 prescription for Prefest , a hormonal medication to treat hot flashes and vaginal dryness, and a December 2004 prescription for Alprazolam, a benzodiazepine used to treat anxiety and panic disorder.  Following her administrative leave on February 14, 2005, she claimed to suffer from "situational anxiety."  Elsewhere in the record, Plaintiff claimed to have a chronic urinary disorder that required frequent trips to the bathroom.

Defendant failed to advise her of her rights under the Family and Medical Leave Act.  Plaintiff does not move for leave to amend her complaint.

"A plaintiff may not use his opposition to a motion for summary judgment, filed long after the answers were filed in this case, as a vehicle to amend his complaint to file additional claims." *Aidnik v. California Department of Corrections and Rehabilitation*, 2010 WL 5059691 at *3 (E.D. Cal. December 6, 2010) (No. CIV S-09-0154 FCD); *Lamon v. Director, California Department of Corrections*, 2010 WL 3448593 at * 7 (E.D. Cal. September 1, 2010), *findings and recommendations adopted by* 2010 WL 5418871 (E.D.Cal. December 23, 2010) (No. CIV S-06-0156 GEB).  Had Plaintiff moved for leave to amend, granting or denying the motion would have been a matter in the sound discretion of this Court.  *Swanson v. United States Forest Service*, 87 F.3d 339, 343 (9th Cir. 1996).  Relevant factors in determining whether justice requires leave to amend include "the presence of absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment."  *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 538 (9th Cir. 1989).  Even if Plaintiff had moved to amend her complaint, granting leave to amend would have been inappropriate.

A motion for leave to amend is not a tool for avoiding summary judgment.  *M/V American Queen v. San Diego Marine Construction Corp.*, 708 F.2d 1483, 1492 (9th Cir. 1983); *Glesenkamp v. Nationwide Mutual Ins. Co.*, 71 F.R.D. 1, 3 (N.D. Cal. 1974), *aff'd*, 540 F.2d 458 (9th Cir. 1976) (*per curiam*).  When the defendant's motion for summary judgment is pending, if the plaintiff has had adequate opportunity for discovery, a court may deny a motion for leave to amend unless the plaintiff can produce "substantial and convincing evidence" supporting the proposed amendment.  *Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 944 (7th Cir. 1995).  In upholding a trial judge's denial of the plaintiff's motion to amend following the defendant's motion for summary judgment, the Seventh Circuit reflected:

> A plaintiff who proposes to amend his complaint after the defendant has moved for summary judgment may be maneuvering desperately to stave off immediate

///

dismissal of the case.  With this a possibility, district judges are not content with an allegation sufficient in law; they want to see some evidence to back it up.

*Cowen*, 70 F.3d at 944.

Here, Plaintiff has not applied for leave to amend but has simply added claims for violation of the Family and Medical Leave Act and, apparently, for failure to provide accommodation under the Americans with Disabilities Act.  Although Plaintiff filed her complaint in 2006, she has never before sought to add these claims and offers no explanation for the delay in asserting them.  The Ninth Circuit has repeatedly held that "[u]ndue delay is a valid reason for denying leave to amend."  *Contact Lumber v. P.T. Moges Shipping Co., Ltd.*, 918 F.2d 1446, 1454 (9th Cir. 1990).  *See also Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 798 (9th Cir. 1991); *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1388-89 (9th Cir. 1990).

Plaintiff has not identified the medical condition giving rise to these new claims, much less supported her allegations against Defendant with substantial or convincing evidence.  Discovery in this case has long since closed, and Defendant will be prejudiced if it is now required to defend against these new claims.  Accordingly, this Court hereby strikes all references to claims related to failure to accommodate, to grant medical leave, or to disclose rights relating to any medical condition of Plaintiff, including but not limited to any claims relating to the Family and Medical Leave Act or the Americans With Disabilities Act.

**III.    Summary Judgment**

**A.    Applicable Law**

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  F.R.Civ.P. 56(c)(2); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears the initial burden of establishing the basis of its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir.

2007).  A fact is material if it could affect the outcome of the suit under applicable law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Ass'n*, 322 F.3d 1039, 1046 (9th Cir. 2003).  A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  *Anderson*, 477 U.S. at 248; *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

When the moving party will have the burden of proof on an issue at trial, it must demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun*, 509 F.3d at 984.  When the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or merely by pointing out that no evidence supports an essential element of the non-moving party's claim.  *See Soremekun*, 509 F.3d at 984; *Nissan Fire and Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." *Nissan Fire & Marine*, 210 F.3d at 1102-03.  If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  *Id.* at 1103.  The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'"  *Estate of Tucker v. Interscope Records*, 515 F.3d 1019, 1030 (9th Cir.) *(quoting* F.R.Civ.P. 56(e)), *cert. denied*, 129 S.Ct. 174 (2008).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  *See Anderson*, 477 U.S. at 255; *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1065 (9th Cir. 2003).  Nonetheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Sanders v.*

-13-

1  *City of Fresno*, 551 F.Supp.2d 1149, 1163 (E.D.Cal. 2008), *affirmed*, 340 Fed.Appx. 377 (9th Cir.

2  2009); *UMG Recordings, Inc. v. Sinnott*, 300 F.Supp.2d 993, 997 (E.D.Cal. 2004). "A genuine

3  issue of material fact does not spring into being simply because a litigant claims that one exists or

4  promises to produce admissible evidence at trial." *del Carmen Guadelupe v. Negron Agosto*, 299

5  F.3d 15, 23 (1st Cir. 2002). A court has the discretion in appropriate circumstances to consider

6  materials that are not properly brought to its attention, even though a court is not required to

7  examine the entire file for evidence establishing a genuine issue of material fact when the

8  opposing party has not set forth the evidence with adequate references. *See Southern California*

9  *Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003); *Carmen v. San Francisco*

10  *Unified School District*, 237 F.3d 1026, 1031 (9th Cir. 2001). If the nonmoving party fails to

11  produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled

12  to summary judgment. *See Nissan Fire & Marine*, 210 F.3d at 1103.

13    **B.    Wrongful Termination**

14    Title VII prohibits employers from discriminating against an individual based on race,

15  color, religion, gender, or national origin. 42 U.S.C. § 2000e-2. To maintain a claim for racial

16  discrimination in violation of Title VII, a plaintiff must establish that (1) she was a member of a

17  protected class, (2) she was performing his job in a satisfactory manner, (3) she was discharged,

18  and (4) the employer sought a replacement with qualifications similar to those of the plaintiff or

19  continued to need an employee with those skills. *Sengupta v. Morrison-Knudsen Co., Inc.*, 804

20  F.2d 1072, 1075 (9th Cir. 1986). To maintain a claim for discrimination on the basis of national

21  origin in violation of Title VII, a plaintiff must establish that she (1) belongs to a protected class,

22  (2) was performing according to his employer's legitimate expectations, (3) suffered an adverse

23  employment action, and (4) other employees with similar qualifications were treated more

24  favorably. *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 n. 5 (9th Cir. 2003).

25    The sole remaining claim in this case is wrongful termination. Defendant terminated

26  Plaintiff's employment as a result of six instances of misconduct: (1) Plaintiff's removing her

27  personnel file without authorization (February 17, 2005); (2) refusing to return her personnel file

28

1   and (3) making false statements regarding its location (February 17, 2005); (4) making false

2   statements to the local police department (February 17, 2005); (5) physically assaulting Nations

3   (February 16, 2005); and (6) verbally assaulting Crooks (February 16, 2005).

4          Plaintiff was clearly a member of a protected class and was terminated from her job, an

5   adverse employment decision.  Defendant continued to require public health veterinarians.

6   Accordingly, unless Plaintiff's performance as a RPHV was satisfactory, she cannot prevail on

7   either count.  To meet her burden, Plaintiff must present evidence of actions taken by the

8   employer that more likely than not resulted from prohibited discriminatory motives.  *Id.*

9          Plaintiff fails to meet this initial burden.  Simply put, Plaintiff sets forth no evidence, other

10  than citations to Plaintiff's own declarations and opinions, that suggests that Plaintiff was

11  performing the position of a RPHV trainee in a satisfactory manner, particularly with regard to her

12  behavior on February 16 and 17, 2005.  In a summary judgment motion, a Plaintiff may not rest

13  merely on the allegations in her pleadings but must present admissible evidence showing there is a

14  genuine issue of fact for trial.  F.R.Civ.P. 56(e)(3); *Brinson v. Linda Rose Joint Venture*, 53 F.3d

15  1044, 1049 (9th Cir. 1995).  A party's subjective personal opinions do not raise a genuine issue of

16  material fact.  *Schuler v. Chronicle Broadcasting Co. Inc.*, 793 F.2d 1010, 1011 (9th Cir. 1986)

17  (addressing the plaintiff's reliance on her own statements that she "felt" competent and was

18  "confident of [her] skills").

19         In evaluating circumstantial evidence of discrimination, courts use the burden-shifting

20  analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Developed to

21  assess claims under Title VII, *McDonnell Douglas* requires a plaintiff to establish a *prima facie*

22  claim by showing

            that (1) he was a member of a protected class, (2) he was qualified for the position
            he sought or was performing competently in the position he held, (3) he suffered an

23

24  ///

25  ///

26  ///

27  ///

28

adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other action suggests discriminatory motive.

*Guz v. Bechtel National, Inc.*, 24 Cal 4th 317, 355 (2000).[7]

The burden then shifts to the employer to "set forth competent, admissible evidence of its reasons, unrelated to" discrimination, for taking the allegedly adverse action.  *Guz*, 24 Cal.4th at 357.  Here, Plaintiff alleged that her dismissal resulted from her ethnicity or national origin; Defendant responded with evidence that Plaintiff was dismissed for a valid reason: her inability to satisfactorily perform her job responsibilities.  Plaintiff must then present evidence tending to show that Defendant's reason is pretextual.

The principle purpose of summary judgment is "to isolate and dispose of factually unsupported claims."  *Celotex Corp.*, 477 U.S. at 323-24.  Summary judgment is properly granted against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322; *Citadel Holding Corp. v. Roven*, 26 F.3d 960, 964 (9th Cir. 1994).  Designed to ensure that the plaintiff has his day in court even if direct evidence is unavailable, *McDonnell Douglas* is applied when a plaintiff alleges that a defendant has supplied a false pretextual reason for the employment decision when discrimination was the actual reason.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993).  To prevail in a summary judgment motion, the plaintiff must produce sufficient evidence to raise a genuine issue of material fact whether the reasons put forth by the employer were a pretext for discrimination.  *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000), *cert. denied sub nom Gentile v. Quaker Oats Co.*, 533 U.S. 950 (2001); *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 892 (9th Cir. 1994).  Although a plaintiff may rest on the evidence used to establish his *prima facie* claim at step one, if that evidence was the minimum needed to create a presumption of discrimination under *McDonnell Douglas*, the plaintiff will have failed to raise a triable issue of fact.  *Wallis*, 26 F.3d at 890.

---

[7] Claims under Title VII and the Fair Employment and Housing Act (California Government Code §§ 12900 et seq.) ("FEHA") are subject to the same analysis.  *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000).

A plaintiff can prove pretext either directly, by showing that the employer was more likely than not motivated by prejudice, or indirectly, by showing the employer's explanation is not worthy of belief since it is internally inconsistent or otherwise unbelievable. *Raad v. Fairbanks North Star Borough School District*, 323 F.3d 1185, 1194 (9th Cir.), *amended*, 2003 WL 21027351 ( 2003).  Very little direct evidence is necessary to defeat summary judgment. *E.E.O.C. v. The Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009).  "Stray remarks" are insufficient evidence of discrimination. *Merrick v. Farmers Insurance Group*, 892 F.2d 1434, 1438-39 (9th Cir. 1990). Repeated derogatory remarks are strong evidence of intentional discrimination. *Mustafa v. Clark County School District*, 157 F.3d 1169, 1180 (9th Cir. 1998).  In either case, context, inflection, tone of voice, local custom, and historical usage are relevant considerations. *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006).   Indirect evidence must be specific and substantial. *The Boeing Co.*, 577 F.3d at 1049; *Coghlan v. American Seafoods Co. LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005).  In response to the pending motion, Plaintiff provides no such evidence.

 If the employer bears its burden, the plaintiff must "rebut this facially dispositive showing by pointing to evidence which nonetheless raises a reasonable inference that intentional discrimination occurred." *Id.*  "[W]hen the employer proffers a facially significant lawful reason for the challenged action, the entire *McDonnell Douglas* framework ceases to have any bearing on the case, and the question becomes whether the plaintiff has shown, or can show, that the challenged action resulted in fact from discriminatory animus rather than other causes." *Reeves v. Safeway Stores, Inc.*, 121 Cal.App.4th 95, 112 (2004) (*internal citations omitted*).

The only arguably direct evidence of intentional prejudice presented by Plaintiff is her own answer in her deposition that she believed that Fulnechek spoke derogatorily "[a]bout my Thailand, and also looked down on my Thailand education.  But I can say it, as I recall that I answer him back about he insulted me about why Ph.D. cannot answer the regulations of poultry inspection.  I said my Ph.D. was in rabies immunohistochemistry."[8]  Plaintiff claimed not to recall

---

[8]  Defendant having lifted the quotation from the transcript for its own purposes, this Court does not know whether the ensuing colloquoy shed more light of Plaintiff's answer.  Since Plaintiff did not provide additional portions of her deposition, relying solely on the excerpt provided by Defendant, this Court concludes that it did not.

any specific derogatory comments regarding her ethnicity or national origin.  Considered in the context of the record as a whole, Plaintiff's answer appears more relevant to Plaintiff's own reluctance to learn and apply departmental regulations in her role as a supervising veterinarian than to Fulnechek's attitude toward Plaintiff's race or national origin.

Plaintiff never advanced beyond her barely sufficient initial contentions.  Defendant produced evidence including abundant references to Plaintiff's reluctance to learn and apply applicable regulations rather than rely upon her personal opinion, albeit an opinion formed through graduate veterinary education.  For example, in the February 16, 2005 meeting that gave rise to two of the incidents of misconduct leading to Plaintiff's termination, Plaintiff refused to consult the regulations as Fulnechek directed her, becoming agitated and accusing Fulnechek of trying to trick her.

In Plaintiff's memorandum of points and authorities, Plaintiff characterized as "insulting" an evaluation comment by Samples, noting Plaintiff's inability to develop a systematic thought process and her refusal to change her attitude based solely on feedback from her mentor.  Plaintiff responded, "Dr. Sample wrote this insulting statement about me (a person who earned PhD degree in veterinary pathology at University of Tokyo, and Masters Degree in Preventive Medicine at University of California, Davis.)"  Plaintiff's statements do not support a conclusion that Fulnechek or Sample or both made derogatory comments regarding Plaintiff's ethnicity, but that Plaintiff mistakenly interpreted any criticism of her performance as attacks upon her education, which she received primarily in Thailand and Japan.

Ultimately, the plaintiff bears the burden of proving by a preponderance of the evidence that the employer violated Title VII. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  Other than denying their occurrence, Plaintiff fails to do more than deny Defendant's reasons for her discharge: her misconduct during the instructional meeting on February 16, 2005, and the succession of events attendant to her removal of Plaintiff's personnel file from Fulnechek's office on February 17, 2005.  Instead, relying solely on the certificate of completion presented to her at the end of the initial training period, she contends that Defendant's

1  determination to extend her training was formed too long after the conclusion of the initial

2  training period to be credible.

3        Plaintiff denies that she was ever given any negative feedback during her original

4  internships under Fulnechek and Sample but provides no evidence other than the certificate of

5  completion to support her contention.  Plaintiff disproves her own contention, however, in her

6  attribution of Fulnechek's and Sample's negative assessments of her job performance to ethnic

7  prejudice.  She adds that, because Fulnechek's and Sample's evaluations did not find exactly the

8  same items well-performed or sufficient, the evaluations are unworthy of belief.  She does not

9  acknowledge that, although Fulnechek and Samples focused on differing aspects of Plaintiff's job

10  performance and evaluated individual items somewhat differently, both finally concluded that

11  Plaintiff lacked key attributes necessary to satisfactorily perform the analysis and supervision

12  required of a RPHV.  Interestingly, at the same time that Plaintiff insists that Fulnechek's and

13  Sample's evaluations are not credible because the details are not sufficiently similar, she contends

14  that all the negative evaluations of her job performance resulted from a conspiracy to discharge

15  her for impermissible reasons of race or national origin.

16        As evidence that she was performing satisfactorily in the RPHV position, Plaintiff relies

17  on evaluations of her performance as an inspector before she was promoted to the RPHV position.

18  Plaintiff also argues that her performance could not have been unsatisfactory because it only

19  *bordered on unsatisfactory*.  And, in a classic example of *post hoc, propter hoc* reasoning, she

20  argues that the decision to require additional training must have been designed as retaliation since

21  it occurred just after communication between her representative and the EEO commission,

22  regarding her pending discrimination claims that arose during her tenure in California.  All

23  relevant employees of Defendant deny knowing of or basing any decision on Plaintiff's race or

24  national origin, and Plaintiff provides no evidence whatsoever tending to disprove their

25  contentions.

26        Plaintiff asserts that she satisfactorily performed two assignments as relief VMO in the

27  time period between completion of her formal training and the September 17, 2004 meeting at

28

which Endersby informed her of her marginal performance during her internships.  But Plaintiff

provides no evidence, such as written records regarding her performance in these assignments, to

buttress her claim that her work in these assignments ever occurred, much less that it was

satisfactory.

For the nearly five months had elapsed from the September conference to Plaintiff's

removal from her position in February, Plaintiff provides no evidence that she had satisfactorily

performed her duties.  Instead, advancing the contentions stricken above, she implicitly

acknowledges her failure to perform satisfactorily and contends, for the first time in this motion,

that she was ill and denied leave or accommodations.  And she merely denies that any of the

alleged misconduct that directly led to her termination occurred.  The inconsistency in these two

contentions is troublesome.  On one hand, Plaintiff contends that she never conducted herself in

the manner that led to her termination.  On the other hand, she attributes her misconduct to illness.

Both contentions cannot be correct.

**Verbal and Physical Assault (Claims Five and Six).**  On February 15, 2001, Fulnechek

sent Plaintiff home on administrative leave when she was unable to control her emotions and

become unable to continue to work. The February 16, 2005 meeting addressed proper conduct of

exterior inspections following Plaintiff's discovery of a puddle of red water and chicken fat that

had overflowed from a drain cover.  The statement of Consumer Safety Inspector Crooks both

gives a succinct account of the meeting and some insight into the personalities and interaction of

the inspection team, particularly of Plaintiff and Fulnechek:

> [Plaintiff] performed the outside premises tour earlier in the day and observed a
> situation she believed was a noncompliance.  She told about a puddle of red water
> with some chicken fat that had overflowed from a drain cover.  Dr. Fulnechek
> asked her what regulation she would cite on the Noncompliance Record.  She said
> 416.2, Grounds and Pest Control.  She continued that what she saw would be a
> harborage for pests such as rats and mice.  Dr. Fulnechek told her it was not a
> Grounds and Pest Control deficiency, but that it might be nonconformance with
> another regulatory requirement.  [Plaintiff] repeated many times that it was a
> noncompliance.  Dr. Fulnechek asked her if she was going to issue a
> Noncompliance Record.  She said no because the company had fixed the problem.
> Dr. Fulnechek told her that when inspection personnel found a noncompliance they
> were expected to issue a Noncompliance Record. [Plaintiff] continued to argue that
> she was right and raised her voice more than once.  She leaned back in her chair,
> crossed her arms, smiled and said, "I can play this game, too!"  Dr. Fulnechek told

her this was not a game.  He explained that she needed to think the situation through. [Plaintiff] told Dr. Fulnechek that he was not a good supervisor because when she wants to know if something is a noncompliance or not, he tells her to look at the regulations and decide because she needs to think on her own, like a veterinary supervisor should.

Many times during the discussion, [Plaintiff] kept trying to talk about other subjects from the past and at other plants.  Dr. Fulnechek told her that was not what we were talking about and asked her to go back to the subject. [Plaintiff] then started about me and yesterday's happenings.  She told me she wrote me up because I didn't perform tests like Jim and Morris (Consumer Safety Inspectors James Pentz and Morris Nations).  She said I needed to practice more.  I tried to explain that because I did the tests differently than the other inspectors didn't mean I was wrong.  She kept interrupting me and would not let me talk.  She raised her voice and said she was right and knew better than us.  Dr. Fulnechek told her to listen to what I had to say, but she ignored him.  I tried to tell her I knew how to calibrate my thermometer.  She yelled at me calling me a liar.  Dr. Fulnechek told her that was unacceptable behavior and would not be tolerated.  She got up and went to the phone, then slammed the phone back down and crossed the room toward Morris.  Before Morris could get out of the way, she shoved him with both hands, causing him to loose [*sic*] his balance.  She yanked the door open hitting him with it.

[Plaintiff] then entered the inspector's break room.  Most of them were just starting to eat their lunch. She went around to the far side of the tables and got behind two visiting inspectors. She shouted, "Help me . . .save me . . . Dr. Fulnechek is policing me again!"  She said this twice which scared some inspectors.

Doc. 49-9, p. 11.

Plaintiff's responds by alleging that Fulnechek, Crooks, and Nations conspired against her, contending that all three were biased against her and that neither Crooks or Nations would have testified against Fulnechek.  Plaintiff first claims, without presenting any evidentiary support other than her own say-so, that Nations had earlier assaulted her with "possibly rolled up newspapers." Even if Nations had previously assaulted Plaintiff, a previous assault would not have justified Plaintiff's physical actions against Nations.

Plaintiff then denies that she called Crooks a liar, characterizing her actions as simply objecting to Crooks's statements.  Plaintiff acknowledges her outburst to the assembled inspectors in the lunchroom as a "natural reaction from [Plaintiff] who just experienced harassment and abuse during a meeting with Dr. Fulnechek, CSI Nations, and Crooks."

Not only are Plaintiff's assertions unsupported by any evidence whatsoever, they tend to reinforce the agency's contentions that Plaintiff failed to appreciate her shortcomings in such

nontechnical areas as supervising employees and enforcing agency regulations.  Plaintiff's belief

that her lunchroom outburst was natural and excusable reveals her profound misunderstanding of

the role of a supervisor of the inspectors to whom she complained of their supervisors' role in an

instructional meeting.  That Nations sought to shield Plaintiff's conduct from the line inspectors

reveals both the agency's expectations of supervisor behavior and Plaintiff's own misconception

of her role as a supervisor and of her inability to accept criticism of her mistakes and the

instruction necessary to her ultimate satisfactory performance of her new position.

**Plaintiff's Removing Fulnechek's File (Counts One, Two, and Three).**   When

Fulnechek briefly left his office on the morning of February 17, 2005, Plaintiff removed the

personnel file in which he kept his notes on Plaintiff from an unlocked file drawer in his office.  In

a sworn declaration, Inspector Rebecca Patlan-Garcia reported that she had seen Plaintiff leave

Fulnechek's office with a file folder, saying, "I have a right to this file.  It is mine."  In the

presence of Crooks and Nations, Fulnechek asked Plaintiff whether she knew the location of her

folder.  After first accusing Nations or Crooks of having taken the folder, Plaintiff replied that she

had taken the folder and would exchange it for her formal personnel folder ("the bigger file

containing all the lies [Fulnechek] wrote about her").  Plaintiff then told Fulnechek that she took

the folder but no longer had the folder, saying first that she given it to her attorney, and later said

that she had given it to the police.

Plaintiff denies that she ever took the folder or confessed to having it.  Producing a copy of

Fulnechek's December 2004 memo indicating his intent to give Plaintiff a complete copy her file

at a later date, she maintains that she had no reason to take the folder since she was given a copy

of her personnel folder in December 2004.  There are two problems with her argument.  First,

while Fulnechek may have intended to give Plaintiff a complete copy of her file, his memorandum

does not support the proposition that he actually gave Plaintiff the copy.  In addition, even if

Fulnechek gave Plaintiff a copy as she contends, her receiving a copy does not mean she had no

reason to take Fulnechek's copy.  Indeed, if the file supported the proposition that Plaintiff was

not satisfactorily performing her job or had engaged in misconduct, Plaintiff had an even greater

reason to remove Fulnechek's copy to eliminate the record of her performance under Fulnechek's

supervision at George's.

In light of the multiple witness affidavits of Fulnechek, Nations, Crooks, and Endersby,

reporting multiple instances on which Plaintiff denied having taken the file, then confessed but

claimed no longer to have the file, Plaintiff's bare assertion that she neither took the file nor

confessed to having taken it is not persuasive, particularly in the absence of any evidence

whatsoever supporting her assertions.

Patlan-Garcia declared that she witnessed Plaintiff removing the file from Fulnechek's

office.  Plaintiff contends that Patlan-Garcia's sworn statement was a fabrication since it was

made several days after February 17, 2005.  Patlan-Garcia, who told the Merit Systems Protection

Board that she had no relationship with Plaintiff other than working in the same plant, explained

the delay saying that she had no reason to know that the actions that she witnessed were relevant

to anything, particularly Plaintiff's dismissal from employment.

**Plaintiff's Making False Statements to the Police Department (Count 4).**  Plaintiff

contends that she never told the Springdale Police Department that Fulnechek had her in a

"submission hold."  She maintains that her version of the call is supported by the "verified CD"

that she presented as evidence in the administrative hearings.  The Merit Systems Protection

Board rejected the "verified CD":

> In support of her appeal, [Plaintiff] submitted what she purported to be a copy of
> the tape of the 9-1-1 call she made to the Springdale Arkansas police on February
> 17, 2005. [Plaintiff] did not submit <u>any</u> documentation from the Springdale
> Arkansas Police Department which would authenticate that this was the complete,
> unedited, tape recording of the 9-1-1 call.  In fact, during her testimony, the
> appellant conceded that the tape she submitted to the Board was not the actual tape
> she received from the Police Department but was instead a copy that she made of
> the tape.  I give little or no weight to the tape submitted by [Plaintiff] because it has
> not been authenticated.  However, I note that, although [Plaintiff] stated in her
> response to the notice of proposed removal that she "never mentioned that Dr.
> Fulnechek physically touched her," on the tape she submitted you can hear her
> saying that she had been "physically touched."

Exhibit 15 at 13-14.

Plaintiff takes no further steps on appeal to authenticate the tape.

///

In response, Defendant provided a copy of the Police Department's incident report, which noted that an unknown woman called to report that her supervisor had placed her in a submission hold. The call disconnected before the dispatcher received further information. When police officers Stacy Bohannon and Josh Carlson responded to George's to investigate the call, the caller was identified as Plaintiff. She advised the officers that her supervisor had not touched her but was harassing her and wanted her to resign.

**IV.   Conclusion and Order**

Plaintiff was promoted from a position in which she was successful to one in which she was unable to perform satisfactorily. Ultimately, Defendant discharged Plaintiff from its employ. Plaintiff believes that she was treated unfairly. Unfortunately, an individual's subjective belief that he or she has not been fairly treated is not a sufficient basis for an employment discrimination suit. In this case, Plaintiff produced no evidence tending to demonstrate the existence of a dispute of material fact. Accordingly, granting Defendant's motion for summary judgment is appropriate.

This Court hereby ORDERS that

1.   Defendant's motion for summary judgment or summary adjudication is GRANTED; and

2.   Defendant is entitled to judgment as a matter of law on Plaintiff's claim of wrongful termination.

IT IS SO ORDERED.

**Dated:   April 8, 2011**                          **/s/ Sandra M. Snyder**
                                                     UNITED STATES MAGISTRATE JUDGE